EARLE, Collector of Internal Revenue, v.
W. J. JONES & SON, Inc.

UNITED STATES v. W. J. JONES
& SON, Inc.

No. 13148.

United States Court of Appeals
Ninth Circuit.

Dec. 24, 1952.

Charles S. Lyon, Asst. Atty. Gen., Ellis
N. Slack, I. Henry Kutz and Joseph F.
Goetten, Sp. Asst. to the Atty. Gen., Henry
L. Hess, U. S. Atty., Donald W. McEwen,
Asst. U. S. Atty., Portland, Or., for appellant.

Wilbur, Mautz, Souther & Spaulding,
William H. Kinsey, of Portland, Or., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

These appeals involve two suits brought
by appellee, plaintiff below, for refund of
income and excess profits taxes. Both actions presented identical questions of law
and fact and were divided into two complaints solely for pleading and jurisdictional purposes. The first was brought against
Hugh H. Earle, who at the time the action
was commenced was Collector of Internal
Revenue for the District of Oregon, for
refund of income taxes collected by him for
the years 1946 and 1947. The second action
was brought for refund of part of the income taxes paid for the year 1946 and for
excess profits taxes paid for the year 1944.
The Collector of the taxes involved in the
latter action was out of office when the suit
was commenced, and the action was therefore brought against the United States under 28 U.S.C.A. § 1346.

The actions were consolidated for trial
and a single judgment was rendered awarding the taxpayer the total amounts claimed
in both actions—$43,220.61 plus interest in
the first action and $37,865 plus interest in
the second. From that judgment the Collector and the United States have prose-

cuted this appeal. The lower court rendered no opinion in this case.

The basis for the taxpayer's refund claims was a net operating loss of $134,555.21 alleged to have been incurred in 1948 by virtue of certain notes held by the taxpayer becoming partially worthless in that year.[1] The taxpayer took advantage of operating loss carry-back provisions to claim refunds for the years 1946 and 1947. The carry-back of the loss to 1946 absorbed the total net income of the taxpayer for that year and resulted in an unused excess profits tax credit. This credit was carried back to 1944 and formed the basis for the taxpayer's claim for a refund of excess profits taxes paid by him in that year.

The sole question before this Court is whether the notes charged off as worthless by taxpayer in 1948 were in fact evidences of debt or whether, as appellants contend, they represented only a proprietary interest in a Mexican corporation which was the purported debtor on the notes.

Taxpayer is a stevedoring corporation of Oregon. Its stock is owned wholly by W. J. Jones, his wife and his two sons. W. J. Jones was the promisee on the notes in question, having secured them for advances to a certain Mexican mining corporation of which Jones was a principal stockholder. Taxpayer procured the notes from Jones by indorsement without recourse. It was appellants' theory below that the advances made by Jones to the Mexican corporation were in fact capital contributions and that taxpayer, being the mere alter ego of Jones and having taken the notes with complete notice of all of the transactions involved, stood in the shoes of Jones and could not claim to be a creditor on the notes when Jones himself was not.

The Court below found as a fact that the advances of Jones to the Mexican corporation were intended to constitute, and did constitute, loans rather than contributions to capital. Further, the Court concluded as a matter of law that regardless whether the notes could be considered as evidences of debt in the hands of Jones, taxpayer is entitled to recognition as a separate entity distinct from Jones for tax purposes, and since taxpayer purchased the notes for value they constituted debt obligations in its hands. Appellants attack the foregoing finding of fact and conclusion of law.

The finding of fact that the advances were loans must be sustained unless clearly erroneous.[2] Contrary to contentions of appellants, the oral testimony in this case is not in conflict with the documentary evidence so as to render the testimony extremely doubtful and thus permit us to disregard the finding and draw our own inferences from the record.[3] The oral testimony was substantially consistent with the undisputed facts, and we must apply it with "due regard * * * to the opportunity of the trial court to judge of the credibility of the witnesses."[4] And we should be reluctant to disturb the finding of the trial court where, as here, the question whether the advances gave rise to debts or to a proprietary interest depends upon the determinative *intent*[5] of the parties to the

1. Taxpayer claimed the deduction under I.R.C. § 23(k) (1), 26 U.S.C.A. § 23(k) (1), the pertinent portion of which reads as follows:

"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:
 *    *    *    *    *
"(k) Bad debts.

"(1) General rule. Debts which become worthless within the taxable year; * * * and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *"

2. Fed.Rules of Civ.Proc.Rule 52(a), 28 U.S.C.A.; Maloney v. Spencer, 9 Cir., 172 F.2d 638; Smyth v. Barneson, 9 Cir., 181 F.2d 143.

3. Cf. United States v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746, rehearing denied, 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147; Orvis v. Higgins, 2 Cir., 180 F.2d 537, certiorari denied 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595; Fritz v. Jarecki, 7 Cir., 189 F.2d 445.

4. Fed.Rules of Civ.Proc.Rule 52(a), 28 U.S.C.A.; Smyth v. Barneson, 9 Cir., 181 F.2d 143.

5. Wilshire & Western Sandwiches v. Commissioner, 9 Cir., 175 F.2d 718, 720;

critical advances. "Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them."[6]

■ It is necessary to examine the facts underlying the advances in question. In June of 1944, Jones was contacted by one D. D. Kroder and was informed that Kroder had located and procured an option to buy four groups of valuable gold mining properties in Mexico. Kroder desider Jones to purchase the property for a mining venture. Jones then interested John C. Higgins of Portland, Oregon, who possessed experience in underground mining. After receiving favorable reports on the property from D. E. Harris, a friend of Jones, and two mining managers sent to examine the property, Jones and Higgins procured an option in July of 1944 to purchase Kroder's option on the property. It was agreed that Kroder was to receive one-third of the stock of a Mexican corporation to be organized to exploit the property, and Jones and Higgins were to receive the other two-thirds. Later, Kroder's interest was reduced to 20%, 10% of which was to go to a certain A. E. Johnson, an associate of Kroder. In August of 1944, D. E. Harris, as agent and trustee for Jones and Higgins, procured a new option from the owners to buy the property.

Higgins and Jones then consulted Malcolm Little, an attorney who was qualified to practice both in the United States and Mexico. Little advised them not to organize a new Mexican corporation because of a Mexican law which required 51% of the stock to be owned by Mexican nationals. As the only practicable alternative, Jones and Higgins followed Little's advice and utilized the corporate structure of an existing and non-operating Mexican mining company, known as "Mina Del Refugio, S. A.," which had been organized prior to the law requiring majority ownership of stock by Mexicans.

In October of 1944, Mina Del Refugio, having acquired the option from Harris, contracted to buy the mine property. The purchase price was $40,000, with a $10,000 down payment and the balance payable in annual installments for the next three years.

In November of 1944, an agreement was executed by Jones, Higgins and Harris as first parties and Mina Del Refugio as the second party. In substance it provided that to meet the expenses of exploiting the mine property the first parties would advance money and equipment to and for the use of the corporation; that for all advances theretofore or thereafter made the corporation would be obligated as a debtor and would issue its notes, payable in two years, with interest at 6% payable at maturity. The agreement provided that a sum would be paid immediately by the first parties sufficient to pay up the "capital social" of the corporation, which was fixed by its articles of incorporation at 5,000 pesos (approximately $1,000).[7]

This means of financing the venture was adopted for several reasons. First, it was feared that any increase in the capital stock of the corporation might cause the parties to run afoul of the law requiring the majority of the stock in new corporations to be owned by Mexicans. Second, Higgins, Jones and Harris wanted to subordinate the interests of Kroder and Johnson, who had contributed no money, materials or services to the venture. Finally, it was believed that the position of foreign creditors would be preferable to that of proprietors if, as had happened in the past, certain political groups came into power in Mexico and sought to expropriate the mining property by decree.

In March of 1945 it was agreed as between Jones, Higgins and Harris that $3,000 previously advanced by Harris would be his total investment in the venture and

Matthiessen v. Commissioner, 2 Cir., 194 F.2d 659, 661.

6. United States v. Yellow Cab Co., 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150.

7. That this corporation should not pre-viously have had any paid-in capital appears puzzling to us, but Higgins testified at the trial that it often happened in Mexico that corporations were organized and did business without paid-in capital.

that Jones and Higgins were to share equally in the burden of making such advances of cash and equipment as might be necessary for the mining operation. The 80% of the stock of the corporation remaining after deducting the interests of Johnson and Kroder was to be divided among Jones, Higgins and Harris in proportion to the amounts loaned by each to the corporation. The stock was to be distributed when the amounts of the future advances were finally determined.

Aside from the relatively small amount contributed to pay up the capital stock of the corporation, the only other "capital contribution" consisted of the mining property itself. The testimony at the trial was that the mining property had a value which at that time was conservatively estimated to be at least $50,000 in excess of its purchase price. There was corroboration for this testimony in the fact that in April of 1945 Kroder sold a 9% interest in the corporation for more than $5,000.

When the corporation was organized, Jones and Higgins estimated that a total expenditure of $50,000 by themselves would suffice to develop and operate the mines. It was believed that there was high grade ore which would make it profitable to ship the ore to the smelter without prior milling on the mine property, and that within six months there would be sufficient profits to cover any further development deemed advisable. After a very few shipments, however, it appeared that while there was substantial ore it was not of so high a grade as expected and that in view of high shipping and smelting costs it would be advisable to construct a mill on the property to produce concentrates.

High hopes for the success of the mines continued through 1947. In July of 1945 Klamt, a geologist and mine operator who had charge of the operation, reported that $409,000 worth of ore was blocked out and that there was every indication that the veins being worked would continue. In May of 1946, in response to an inquiry concerning a possible sale of the property, Jones replied that the interest of Higgins and himself would cost $500,000.

Lured on by the prospects of a bonanza, Jones and Higgins advanced a total of $317,106 in the years from 1944 to the end of 1947. Jones had advanced $55,100 by the end of 1945, $128,100 by the end of 1946, and $157,600 by the end of 1947, after which time no further advances were made.

In 1946 Jones indorsed 32 notes of the Mexican corporation, with a face value of $121,763.74, to the taxpayer without recourse. The face value of these notes plus the accrued interest thereon was credited against the indebtedness of Jones to taxpayer, which had been built up largely by personal loans to Jones to finance the Mexican venture.

In January of 1948 it was learned that the amount of gold ore in the mine property had been greatly overestimated. The known ore in the mines was exhausted and no new veins had been discovered. After some further abortive attempts to locate new ore, it was determined in November of 1948 to dismantle the mine and abandon the property. In December of 1948 there was an agreement between Higgins and Klamt that Klamt was to salvage and sell as much of the material and equipment on the property as possible and was to pay from the Mexican corporation's funds "all of the company's outstanding accounts, pay rolls and liabilities" and transmit the balance to a special bank account. $22,500 was realized for payment to the note holders and taxpayer's share amounted to $8,775.

Stock certificates were issued in March of 1948. As to Jones, Harris and Higgins the stock was issued substantially in proportion to their advances to the corporation. The stock at the time of its issuance was worthless.

Taxpayer's attempt to claim an operating loss of $134,555.21 for 1948, which was the difference between the face value of the 32 notes of the Mexican corporation plus accrued interest thereon, and the amount which was realized on the notes, gave rise to this litigation.

On these facts we are of the opinion that the finding of the Court below that the advances were loans was not clearly erroneous. Many judicial criteria have been

developed to determine the intent of the parties where the question is whether transactions have given rise to a debt or to a proprietary interest. Where purported loans are made in proportion to stockholdings the transaction is subject to close scrutiny, but this circumstance is certainly not in itself conclusive that the advances are capital contributions.[8] At any rate, the advances here were *not in direct proportion to stockholdings*, since Kroder and Johnson received a 20% stock interest in the corporation though they advanced nothing.[9] And the so-called capital contributions and loans in the instant case were not unidentified *portions of a single investment*, as was the situation in certain of the cases cited by appellants.[10] The contribution of $1,000 to pay up the capital stock and the contribution of the mine property were recognized as wholly distinct from all other advances, which were expressly regarded as loans.[11] And no inference adverse to taxpayer can be drawn from the fact that the stock certificates were not distributed until the advances had all been made.[12]

Appellants rely upon the failure of the note holders to attempt to collect the principal or interest on the notes when due, and upon the subordination of the notes to other accounts when the mines were dismantled and the equipment sold. Certainly failure to attempt to collect a debt does not *per se* destroy its character as such;[13] and the

same strict insistence upon payment on the due date as would be the case if a bank were the creditor should not be expected where a shareholder, or one who is closely identified therewith, is a creditor.[14] As to the contention that the note holders were subordinated to other creditors, Higgins testified that the *only other debts* owed by the Mexican corporation were for salaries and taxes, which had priority under Mexican law. There is no inherent improbability in this testimony, when it is considered that Jones and Higgins had made their large advances for the very purpose of meeting equipment and other large expenditure items, that the operation of the mines had been slowing for nearly a year, and that it was necessary, if the mining equipment and materials were to be sold, that they should be kept free of liens.

Appellants also contend that this is a case of a corporate financial structure so overbalanced by indebtedness that it is lacking in substance for recognition for tax purposes. Considering (as we think it should be considered) the mine property as a part of capital,[15] the ratio of debt to capital, after all advances had been made, and taking the most conservative estimate of the value of the mine property at the time of incorporation, was about six to one. We are not at all certain that such a financial structure is lacking in substance for recognition for tax purposes.[16] Certainly there

8. Wilshire & West Sandwiches v. Commissioner, 9 Cir., 175 F.2d 718; cf. Maloney v. Spencer, 9 Cir., 172 F.2d 638, where the sole shareholder of the corporation was also its creditor.

9. Cf. Arthur V. McDermott, 13 T.C. 468.

10. 1432 Broadway Corporation v. Commissioner, 4 T.C. 1158, affirmed per curiam in 2 Cir., 160 F.2d 885; Janeway v. Commissioner, 2 T.C. 197, affirmed 2 Cir., 147 F.2d 602.

11. See Arthur V. McDermott, 13 T.C. 468, distinguishing Janeway v. Commissioner, supra note 10, on this basis, inter alia.

12. Cf. Wilshire & West Sandwiches v. Commissioner, 9 Cir., 175 F.2d 718.

13. Smyth v. Barneson, 9 Cir., 181 F.2d 143.

14. Wilshire & West Sandwiches v. Commissioner, 9 Cir., 175 F.2d 718.

15. In Cleveland Adolph Mayer Realty Corp. v. Commissioner, 6 T.C. 730, reversed on other grounds in 6 Cir., 160 F.2d 1012, and in New England Lime Company v. Commissioner, 13 T.C. 799, the Tax Court looked to the property paid in and the actual capital of the corporation, as reflected in the market values of its stock, to determine the debt to stock ratio. But cf. Swoby Corporation v. Commissioner, 9 T.C. 887, where the Court apparently used the par value of the stock for this purpose.

16. Cf. Maloney v. Spencer, 9 Cir., 172 F.2d 638 (capital contributions consisted solely of a number of contracts, value not specified in opinion); Spreckles v. Commissioner, 8 T.C.M. 1113 (ratio of debt to capital was approximately six to

were "material amounts of capital" invested in stock.[17] But aside from this, the cases relied upon by appellants are not here in point. This is not a case where the proportion of indebtedness to capital was fixed at the outset, as in Arnold v. Phillips, 5 Cir., 117 F.2d 497, [18] and Swoby Corp. v. Commissioner, 9 T.C. 887; or where the parties *knew* that advances grossly disproportionate to capital stock would be required in the future, as in Schnitzer v. Commissioner, 13 T.C. 43, affirmed 9 Cir., 183 F.2d 70;[19] and Matthiessen v. Commissioner, 16 T.C. 781, affirmed 2 Cir., 194 F.2d 659; or where only nominal capital or none at all was contributed, as in Janeway v. Commissioner, 2 T.C. 197, affirmed 2 Cir., 147 F.2d 602; Thomas v. Commissioner, 2 T.C. 193; Dobkin v. Commissioner, 15 T.C. 31, affirmed 2 Cir., 192 F.2d 392; and Bair v. Commissioner, 16 T.C. 90.

Here the corporation had as capital mining property which the investors at the outset of the venture personally considered was worth many times the conservative estimate of $50,000. The investors believed no more than $50,000 in expenditures would be required. In 1948, of course, with the mine property known to be worthless and the notes still outstanding, it appeared, on hindsight, that the corporation had taken on an excessive debt structure. This was not the result of design but of the unfortunate course of events. The advances were not excessive in light of fairly well grounded estimates of the value of the mining property at the time the advances were made. To say that the advances were "gambled" and placed at the risk of the business does not

help appellants. All unsecured loans involve more or less risk. On all available information, the risk here was a good one. And it cannot be said, in contravention of the testimony at the trial, that the holders of the notes had no reasonable expectation that they would be repaid.[20]

We cannot find a tax avoidance motive here. The Mexican corporation was not subject to United States income taxes. The usual purpose to obtain a deduction for payment of interest on indebtedness could not have been present. And it is almost inconceivable that in their unbounded optimism at the outset of the venture the investors contemplated the tax benefits which would flow from deductions for worthless debts. There was abundant evidence of a business purpose to finance the venture by means of loans. The notes were treated as evidences of indebtedness on the books of both the taxpayer and the Mexican corporation.[21] The taxpayer accrued interest on the notes and paid income tax thereon. The contract between the Mexican corporation and the investors provided that the holders of the notes could demand chattel mortgages on equipment delivered to the Mexican corporation to secure payment therefor. All of these facts point to the existence of a bona fide debt.

Since the Court below was not clearly in error in finding as a fact that the advances were loans, it is unnecessary to determine the question whether the acts of Jones are attributable to the taxpayer or whether taxpayer is a separate entity for tax purposes under the facts of this case.

The judgment is affirmed.

one); McDermott v. Commissioner, 13 T.C. 468 (ratio of debt to capital was approximately 108 to 5).

17. John Kelley Co. v. Commissioner, 326 U.S. 521, 526, 66 S.Ct. 299, 90 L.Ed. 278.

18. Cert. denied, 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539.

19. Cert. denied, 340 U.S. 911, 71 S.Ct. 291, 95 L.Ed. 658.

20. Cf. Maloney v. Spencer, 9 Cir., 172 F.2d 638; Ewing v. Commissioner, 5 T.C.M. 908.

21. Maloney v. Spencer, 9 Cir., 172 F.2d 638, 641.