ROYALTY SERVICE CORPORATION,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 1994–1998.

United States District Court
D. Montana,
Great Falls Division.

Nov. 12, 1959.

Jardine, Stephenson, Blewett & Weaver, Great Falls, Mont., for plaintiff.

Howard A. Heffron, Asst. Atty. Gen., Lyle M. Turner, Fred J. Neuland, John J. Kilgariff, Attorneys, Washington, D. C., and Krest Cyr, U. S. Atty., Butte, Mont., Waldo N. Spangelo, Asst. U. S. Atty., Billings, Mont., for defendant.

JAMESON, District Judge.

In five actions, consolidated for trial, the taxpayer, Royalty Service Corporation, seeks a refund of corporate income taxes for the years 1949, 1950, 1951, 1952 and 1953. The cases were submitted upon an agreed statement of facts, supplemented by testimony of the president, secretary-treasurer, and accountant of the plaintiff taxpayer.

The primary question is whether payment by the taxpayer on promissory notes held by two stockholders constituted interest within the meaning of Section 23(b) or distribution of profits within the meaning of Section 115(a) of the Internal Revenue Code of 1939.[1]

The taxpayer is a Montana corporation organized on July 29, 1948, with an authorized capital of $400,000, represented by 300,000 shares of Class A and 100,000 shares of Class B capital stock, each of a par value of $1 per share. The Class A stock is preferred until $1 per share in dividends has been paid thereon, but Class A stock has no voting rights or voice in management. At the time of incorporation one share of Class B stock was issued to each of the incorporators, G. A. Frary, his wife, B. L. Frary, and Paul A. Wolk. No Class A stock was issued at that time.

The taxpayer was organized for the purpose of acquiring and operating oil and gas leases known as the Tarrant properties. R. C. Tarrant, an oil operator, had developed the leased properties, but in acquiring capital for development had sold royalties out of his working interests to the point where some of the leases were uneconomical to operate and production had more or less ceased.[2] Tarrant and his associates sold the leases to W. M. Hewitt and associates in 1947.

Early in 1948 G. S. Frary, a successful operator in the oil field, became interested in rehabilitating the properties. By a letter dated July 26, 1948, he set forth a proposition to Hewitt, which was accepted, whereby the taxpayer corporation was to be organized to purchase the leases for $150,000, Frary and Hewitt each to loan the corporation $75,000 and to receive the taxpayer's promissory notes, payable three years after date, with interest at five percent, and with a provision that monthly payments could

1. Section 23 of Internal Revenue Code of 1939 provides in part:
"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:
* * * * *
"(b) Interest. All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter." 26 U.S.C. 1952 ed., § 23.
Section 115 provides in part: "§ 115. Distributions by corporations—(a) Definition of Dividend. The term 'dividend' when used in this chapter (except * *) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made." 26 U.S.C. 1952 ed., § 115.

2. In nine of the sixteen leases, the reduced working interest was less than 50 percent, and in some less than 20 percent.

be made thereon. The agreement provided further that if the royalty owners could be induced to exchange their royalty interests for Class A stock, Hewitt and Frary would convert an equal amount of their loans to Class A stock.

Frary became president of taxpayer corporation. On August 2, 1948, taxpayer purchased the leases from Hewitt and his co-owners, Hewitt himself owning a one-half interest. Frary advanced $82,500, of which $75,000 was paid to the owners of 50 percent of the leases and the remaining $7,500 was paid to Hewitt. Hewitt accepted taxpayer's note for $67,500 for his remaining interest in the leases. The note to Frary was dated August 23, 1948, and the note to Hewitt, November 3, 1948.

In December, 1948 Frary, as president of taxpayer, wrote to the royalty owners of some of the leases offering to negotiate an exchange of Class A stock for royalty interests. Since some of the royalty owners lived outside of Montana, this required compliance with SEC regulations. Upon being so notified by the SEC the plan was dropped. Taxpayer then proceeded to acquire working interests in the leases,[3] and by the end of

1952 had profitable working interests in all of the leases. Taxpayer was financially successful from the beginning, although Frary made some short term advances which are not in question here.

Interest was paid on the notes each year, and commencing in 1949, payments were made on the principal each year except 1953, until the notes were paid in full in 1955. Approximately one-third of the principal payments were made in Class A stock and two-thirds in cash. Hewitt accepted a total of 37,800 shares of Class A stock as payments on his note and Frary accepted 5,000 shares of Class A stock as payment on his note. Frary, however, transferred another lease to taxpayer in exchange for cash and 32,800 shares of Class A stock on January 1, 1952.[4]

Hewitt first became a stockholder on May 1, 1951, when 5,000 shares of Class A stock were issued to him as a payment on his note. On the same date 5,000 shares of Class A stock were issued to Frary as payment on his note. Prior to May 1, 1951, the only stock outstanding was three shares of Class B stock, held respectively by Frary, Mrs. Frary, and Wolk. Class B stock alone had vot-

---

3. This was accomplished in various ways: (1) by purchase for cash; (2) by inducing royalty owners to share costs of production; and (3) by abandonment or forfeiture of lease in effect and acquisition of new lease.

4. The following table is a chronological summary of the note and Class A stock transactions:

| | Loans | | | | | Stock Ownership | |
| | Payments | | Bal. Due | | | Class A Stock | |
| Date | Cash | Stock | Hewitt | Frary | Total | Hewitt | Frary |
|---|---|---|---|---|---|---|---|
| 8/23/48 | | | | $82,500 | $82,500 | | |
| 11/ 3/48 | | | $67,500 | 82,500 | 150,000 | | |
| 9/23/49 | $7,500 | | 60,000 | 82,500 | 142,500 | | |
| 7/31/50 | 22,500 | | 60,000 | 60,000 | 120,000 | | |
| 5/ 1/51 | | 10,000 | 55,000 | 55,000 | 110,000 | 5,000 | 5,000 |
| 1/ 1/52 | | | | | | | 37,800 * |
| 6/27/52 | | 32,800 | 22,200 | 55,000 | 77,200 | 37,800 | 37,800 |
| 4/27/54 | 22,200 | | | 55,000 | 55,000 | | |
| 12/31/55 | 55,000 | | | | | 37,800 | 37,800 |

* 32,800 shares Class A stock issued to Frary in part payment for leasehold interest transferred to corporation on 1/1/52.

ing rights.[5] Hewitt has never owned any Class B stock.

Accordingly, for the years 1949 and 1950 Hewitt was not a stockholder, so that for those years it cannot be said that notes were outstanding to stockholders in proportion to their respective stock holdings. Frary and Hewitt held equal amounts of Class A stock from May 1, 1951, to January 1, 1952 and since June 27, 1952. Between July 31, 1950 and June 27, 1952, they had equal amounts loaned to taxpayer. At all other times during the five years in question the loans have been unequal in amounts.

Frary assigned as reasons for taking a note instead of stock (1) the uncertainty of title to the leases, with the attendant possibility that the leases might be lost, in which event he felt that as a creditor he would have a better chance to recover his investment by salvaging the equipment; and (2) that he preferred to be a creditor so he could share pro rata with the other creditors in the assets of the corporation.[6]

William B. Finlay, the certified public accountant with whom Frary conferred prior to organizing the taxpayer corporation, testified that he advised Frary that it would be a poor investment to put money in stock, but feasible to advance money and take notes.[7]

The Government contends "that taxpayer corporation was a 'thin' corporation in that sufficient funds were not invested in the organization to enable it to carry on normal operations, and that the sum of $150,000 advanced by Hewitt and Frary represented in actuality funds advanced to the taxpayer in the form of equity capital, and this was not a bona fide debtor-creditor transaction." The parties agree that if the advances by Hewitt and Frary are considered equity capital for tax purposes, then the interest payments are to be treated as dividends and are not deductible from taxpayer's gross income.

---

5. Frary testified "that the background of the whole lease situation was such that I wouldn't invest any money in a corporation over which I would lose control."

6. Frary testified further that it was not his original intention "to take over the corporation", but rather that the corporation should eventually be owned "by all the people that owned the over-riding royalties, and these various interests we were trying to put back together."

7. Finlay testified as follows:

"A. My advice to him was that if he put money into that corporation with royalties, with a working interest reduced as they were, and he was familiar with that property from the very beginning, that he would be virtually putting up capital for the royalty holders to sit there and draw royalties free of any expenses and so forth, and he would be carrying them for a very low percentage, and I thought it was a poor investment to go into it that way. But I did know that they had physical properties other than leases which were valuable. That is, I mean to say they had equipment and tanks and casing in the wells and pumping equipment.

\* \* \* \* \*

"Q. Did you approve or disapprove organizing the corporation upon the basis that he could be a creditor? A. I thought it was feasible that way.

"Q. And in giving your approval to that plan of procedure, did you regard this as feasible as a means of tax reduction or did you have other factors predominant in your mind? A. We talked over every phase of it, and Mr. Frary was in such high income tax brackets that it was a kind of an unfavorable situation to him because he was normally in from 50 to 63 per cent bracket, whereas the corporation would be normally for this operation perhaps in the neighborhood of 30 per cent, so it was unfavorable as far as taxes were concerned for Mr. Frary.

"Q. How about any other factors other than taxes? A. Well, being a creditor he was in a position to avoid complications that would arise in regard to the titles on the leases and all these hidden claims that were there, and possibly royalty holders that hadn't been paid. There were various considerations for getting a creditor's position rather than a stockholder's.

"Q. In other words, as a result it was your conclusion that his putting himself in a position of a creditor was advisable? A. I think it was. That is what I advised him."

It is well settled that the substance, not the form, of a transaction controls the tax consequences,[8] and generally speaking, "whether advances to a corporation by a stockholder are loans or whether they are capital contributions presents a question of fact."[9] Root v. Commissioner, 9 Cir., 1955, 220 F.2d 240, 242. "None of the decided cases lay down any comprehensive rule by which the question presented may be decided in all cases, and 'the decision in each case turns upon the facts of that case.' * * * In each case it must be determined whether the real transaction was that of an investment in the corporation or a loan to it.[10] On this the designation of the instrument issued by the corporation, while not to be ignored, is not conclusive * * *. The real intention of the parties is to be sought and in order to establish it evidence aliunde the contract is admissible." Commissioner of Internal Revenue v. Proctor Shop, 9 Cir., 1936, 82 F.2d 792, 794. The intent of the parties is very important, if not controlling. Wilshire & Western Sandwiches v. Commissioner, 9 Cir., 1949, 175 F.2d 718, 720–721.

Factors tending to show a bona fide debtor-creditor relationship include the following: (1) the advances were represented by promissory notes bearing interest at a fixed reasonable rate,[11] with a reasonably close (three years) fixed maturity date;[12] (2) the obligation to pay was positive and unconditional;[13] (3) the debt was not subordinated to any other creditors;[14] (4) the interest was paid regularly when due;[15] (5) the holder of one of the notes (Hewitt) had no voting stock at any time and thus had no voice in the management of the corporation, nor did he acquire any Class A stock until two and one-half years after he obtained the note;[16] (6) the stock was not held in any ratio to loans,[17] and there was no agreement among the stockholders to maintain the debt, or share losses, in proportion to stock ownership;[18] (7) a

8. Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981.

9. In this connection it should be noted that Hewitt did not become a stockholder until May 1, 1951, almost three years after taxpayer was incorporated, and two and one-half years after Hewitt made the loan to taxpayer.

10. "There is no one characteristic, not even exclusion from management, which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts." John Kelley Co. v. Commissioner, 1946, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278.

11. See Root v. Commissioner, 9 Cir., 1955, 220 F.2d 240; Arlington Park Jockey Club, Inc. v. Sauber, 7 Cir., 1959, 262 F.2d 902; Thomas v. Commissioner, 1943, 2 T.C. 193.

12. Cf. Swoby Corporation v. Commissioner, 1947, 9 T.C. 887.

13. See Gilbert v. Commissioner, 2 Cir., 1957, 248 F.2d 399.

14. Compare Swoby Corporation v. Commissioner, supra, with New England Lime Company v. Commissioner, 1949, 13 T.C. 799.

15. Cf. Wilshire & Western Sandwiches v. Commissioner, supra, and Earle v. W. J. Jones & Son, 9 Cir., 1952, 200 F.2d 846.

16. Whether outside investors would make such advances is a factor in determining whether the advances are investments in or loans to the corporation. Gilbert v. Commissioner, supra; Arlington Park Jockey Club, Inc. v. Sauber, supra; Matthiessen v. Commissioner, 1951, 16 T.C. 781.

17. "Where purported loans are made in proportion to stockholdings the transaction is subject to close scrutiny, but this circumstance is certainly not in itself conclusive that the advances are capital contributions. At any rate, the advances here were not in direct proportion to stockholdings * * *." Earle v. W. J. Jones & Son, supra [200 F.2d 850]. See also Wilshire & Western Sandwiches v. Commissioner, supra, and Smith v. Commissioner, 1951, 17 T.C. 135.

18. For a discussion of the significance of this factor, see Gilbert v. Commissioner, supra.

business purpose other than tax reduction was served,[19] i. e., through being in a position to share in the assets of the corporation with other creditors,[20] and possibly an improvement of their bargaining position with the royalty owners; (8) the parties intended to create a debtor-creditor relationship; [21] (9) the equity to debt ratio improved steadily until 1955 when the debt was paid in full (Hewitt's note was paid by $29,700 in cash and $37,800 through the issuance of Class A stock; Frary's note by $77,500 in cash and $5,000 through the issuance of Class A stock).

The following factors tend to favor the Government's position: (1) the notes were not secured; [22] (2) the debt to equity ratio at the time of incorporation was 50,000 to one; [23] (3) one of the note holders was also a stockholder and presumably the controlling stockholder.

In support of its contention that taxpayer was a "thin" corporation, the Government relies primarily upon the debt-stock ratio at the time of incorporation. It is true that when the corporation was organized, the advances totaled $150,000 and three shares of stock of the total par value of $3 were issued. Had this ratio continued, the Government's position would be sustained. It is obvious, however, that this was intended to be a very temporary arrangement and, in fact, existed only at the time of incorporation. If computed solely on the basis of the amounts due on the promissory notes and stock actually issued, the ratio is as follows:

|      | Beginning        | End              |
| ---- | ---------------- | ---------------- |
| 1949 | 1 to 50,000      | 1 to 47,500      |
| 1950 | 1 to 47,500      | 1 to 40,000      |
| 1951 | 1 to 40,000      | 1 to 11          |
| 1952 | 1 to 11          | 1 to 1 (Approx.) |
| 1953 | 1 to 1 (Approx.) | 1 to 1 (Approx.) |

The Court of Appeals of the Ninth Circuit in Earle v. W. J. Jones & Son, 1952, 200 F.2d 846, 850, computed the equity-debt ratio by attributing all assets in excess of non-proprietary liabilities to capital to determine the equity part of the ratio. Using this formula for computing equity, the debt to equity ratio would be roughly as follows:

|              |      |         |
| ------------ | ---- | ------- |
| Dec. 31, 1948 | 82   | to 1    |
| "      " 1949 | 7    | to 1    |
| "      " 1950 | 3    | to 1    |
| "      " 1951 | 2    | to 1    |
| "      " 1952 | 1    | to 1.7  |
| "      " 1953 | 1    | to 2.25[24] |

19. See New England Lime Company v. Commissioner, 1949, 13 T.C. 799.

20. Wilshire & Western Sandwiches v. Commissioner, 9 Cir., 1949, 175 F.2d 718.
The instant case is clearly distinguishable from cases where the acts of the lender indicate that the advance is to be at the risk of the venture. In this connection see Arlington Park Jockey Club, Inc. v. Sauber, 7 Cir., 1959, 262 F.2d 902, and also the discussion in Gilbert v. Commissioner, 2 Cir., 1957, 248 F.2d 399, at page 406.

21. See Commissioner of Internal Revenue v. Proctor Shop, 9 Cir., 1936, 82 F.2d 792; Wilshire & Western Sandwiches v. Commissioner, supra; Earle v. W. J. Jones & Son, supra; and Rowan v. United States, 5 Cir., 1955, 219 F.2d 51.

22. See Root v. Commissioner, 9 Cir., 1955, 220 F.2d 240; Matthiessen v. Commissioner, 1951, 16 T.C. 781.

23. See John Kelley Co. v. Commissioner, supra; Swoby Corporation v. Commissioner, supra; Dobkin v. Commissioner, 1950, 15 T.C. 31; Bair v. Commissioner, 1951, 16 T.C. 90; Arlington Park Jockey Club, Inc. v. Sauber, supra.

24. Based on a comparison of total debts to total capital accounts as shown on taxpayer's financial statements attached to the complaints.

Whether the debt-stock ratio is computed on the basis of total debt to total capital account or solely on the basis of amounts due on the promissory notes to stock issued, the ratio was steadily reduced during the period in question. While the ratio of stockholder owned debt to the capital of the debtor corporation is a relevant factor, it is not in itself conclusive. Nor should the Court establish any fixed ratio as a matter of hindsight, without reference to all other relevant facts and circumstances.[25]

The Government concedes "that the formal criteria of indebtedness were satisfied by the form of the notes evidencing the purported loans to the taxpayer," but contends that the sole motive for making what appeared to be loans rather than purchasing stock was tax avoidance. The Government points to the fact that Hewitt and Frary intended to convert their loans to Class A stock if royalty owners could be induced to exchange their royalties for Class A stock to support its contention that the notes were mere sham and not intended to be paid according to their tenor. Had it been possible to carry out this proposed conversion, the debts would have been converted to stock within a short period of time, and these actions would not have arisen. The usual tax avoidance tactic is to convert stock to debts. See John Kelley Co. v. Commissioner, supra.

I cannot agree that the proposal to convert the debts to stock if the royalty owners would do likewise tends to establish a motive of tax avoidance. Taxpayer's accountant testified that with the royalty situation existing when the properties were acquired, Frary "would be virtually putting up capital for the royalty holders to sit there and draw royalty free of any expense * * *." Obviously Frary and Hewitt would be in a better position as creditors themselves to induce the royalty owners to accept stock. It is true of course that this proposal could not be carried out, but at the outset of the transaction there was a substantial business purpose in the proposed arrangement other than tax avoidance.

In support of its contention that no business purpose was served other than tax avoidance, the Government argues (1) that "if all taxpayer owned was the pipe in the holes and the equipment on the leased property * * * Frary and Hewitt as sole owners of taxpayer's stock would be in a more favorable position than Frary and Hewitt as two unsecured creditors of taxpayer;" and (2) Frary and Hewitt "did not expect full repayment unless the taxpayer was successful, and they expected full repayment only out of profit."

Neither contention is persuasive. If there were no other creditors or stockholders, it would make no substantial difference to Frary and Hewitt whether their investments were in the form of stocks or debts. When the corporation was organized, however, there was no assurance that the venture would be successful and that they would be the sole creditors and stockholders of the corporation. Had the venture proved unprofitable, with other unpaid creditors, Hewitt and Frary clearly would have been in a better position as creditors.[26] That was a contingency visualized by Frary and Finlay, the taxpayer's accountant, when the corporation was organized. Moreover, the payment of an indebtedness to a creditor, as well as dividends to a stockholder, usually depends upon income or profits. The fact that payment

25. See Rowan v. United States, 5 Cir., 1955, 219 F.2d 51, 55, where the court also said: "It is entirely within the competence of Congress to provide by statute for such ratio if it deems it advisable or necessary within the scheme of Federal taxation. It is not within our province to do so. Nor would it further the desirable end of certainty in taxes for us to do so."

26. The practice of investors putting part of their investment in a corporation in stock and part in loans to the corporation with the intent of being "in a position to participate with general creditors for part of their investment in the event (the) business was not successful" was expressly recognized and approved in Wilshire & Western Sandwiches v. Commissioner, 9 Cir., 1949, 175 F.2d 718, 719.

of interest and principal were expected to be made, and actually were made, out of profits, does not convert a loan into a stock investment.[27]

 While there are factors, including in particular the debt-stock ratio at the time of incorporation, which tend to sustain the Government's position, considering all of the relevant facts and circumstances, and particularly the intent of the parties at the time of entering into the transaction, it is my conclusion that the transaction was a loan, the interest of which was deductible under § 23(b).

Judgment will be entered for the plaintiff in each case. Pursuant to stipulation of the parties, the amount of the judgment will be submitted to the Internal Revenue Service for computation.

27. See Wilshire & Western Sandwiches v. Commissioner, supra.