Amleto U. Salvadore and Anne Salvadore v. Commissioner.
Salvadore v. Commissioner
Docket No. 851-62.
United States Tax Court
T.C. Memo 1963-327; 1963 Tax Ct. Memo LEXIS 18; 22 T.C.M. (CCH) 1718; T.C.M. (RIA) 63327; December 18, 1963
Guido R. Salvadore, 170 Westminster St., Providence, R.I., for the petitioners. Frederick W. Griffin for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: A deficiency in 1958 income tax of $4,048.88 is contested. The issue is whether the payment of $10,500 to petitioner Amleto U. Salvadore by Salvadore Tool & Findings, Inc., in 1958 constitutes a dividend or the repayment of a loan. Findings of Fact The stipulated facts are hereby found accordingly. Petitioners Amleto U. Salvadore (hereinafter referred to as petitioner) and his wife, Anne Salvadore, reside at 83 Freedom Drive, Cranston, Rhode Island. They filed a joint Federal income tax return for the year 1958 with the district director of internal revenue, Providence, Rhode Island. On January 1, 1947, Andrea Salvadore, petitioner's *19 brother, converted his sole proprietorship into a partnership known as Salvadore Tool Co. (hereinafter referred to as the partnership) and brought in petitioner and his other brother, Joseph, as partners. The partnership engaged in the design and manufacture of tools, dies, stampings, and jewelry findings for the jewelry industry. The business premises of the partnership were located at 71 Troy Street, Providence, Rhode Island, where the partnership initially occupied approximately 1400 square feet and subsequently occupied 2500 square feet. The original capital contributions to the partnership were made as follows: Andrea
$9,476.18
Petitioner
1,800.00
Joseph
1,800.00
The following schedule reflects assets, liabilities, gross receipts, net income, and capital accounts of the partnership as of December 31 of the calendar years designated and for the six-month period ending June 30, 1952: Calendar Year
1947
1948
1949
1950
1951
6/30/52
Cash in bank
$12,994
$ 8,906
$ 18,445
$ 26,201
$ 48,310
$ 5,819
Notes and accounts
2,657
16,672
14,440
21,509
15,762
26,094
receivable
Net depreciable assets
12,055
15,503
18,126
19,177
17,149
32,376
Inventories
321
550
Other assets
765
180
180
100
300
Total assets
$28,471
$ 41,261
$ 51,191
$ 66,987
$ 81,542
$65,139
Accounts payable
2,134
4,127
11,055
12,400
1,604
4,373
Accrued expenses
171
630
1,561
1,623
1,636
2,245
Other liabilities
425
2,241
46
Total liabilities
$ 2,730
$ 4,981 *
$ 12,616
$ 14,023
$ 3,240
$ 6,664
Gross receipts
85,649
111,669
151,462
186,041
205,668
99,708
Net income
30,492
32,926
39,994
47,069
93,190
22,210
Capital accounts
25,741
36,280
38,575
52,964
78,302
58,475
*20 During the 5 1/2 years of its existence the partnership had a total net profit of $265,880.59. On January 17, 1952, Salvadore Tool Co., Inc. (hereinafter referred to as the corporation), was chartered as a corporation under the laws of Rhode Island. The charter was amended December 30, 1952, and the name of the corporation was changed to Salvadore Tool & Findings, Inc. The corporation was not activated until July 1, 1952, at which time Andrea became president, petitioner became treasurer, and Joseph became secretary. As of June 30, 1952, the partners' capital accounts, as adjusted, totaled $56,875.58 * and were allocable to the partners as follows: Andrea
$12,282.27
Petitioner
26,087.26
Joseph
18,506.05
$56,875.58 The capital accounts, as adjusted, included, in addition to the partners' original capital contributions, undistributed partnership profits on which the partners had paid the Federal income tax. The partners transferred *21 to the corporation on July 1, 1952, through a bill of sale, all the partnership assets, liabilities, and capital accounts, and the corporation issued capital stock and set up loans payable as follows: 1
2
3
4
No. of
Capital stock
Loans
Total of
shares
stated value
payable
2 and 3
Andrea
300
$ 5,000
$ 7,282.27
$12,282.27
Petitioner
150
2,500
23,587.26
26,087.26
Joseph
150
2,500
16,006.05
18,506.05
$10,000
$46,875.58
$56,875.58 Entries were made on the corporate books to reflect these transactions. Orders on hand and certain tools and dies transferred by the partnership were not listed in the corporate assets. There was no allocation as to assets, liabilities, and capital accounts transferred for loans payable. The loan payable accounts were not in proportion to the stock. The stockholders agreed that no interest was to be paid by the corporation on the loan accounts. It was also agreed that petitioner's loan would be liquidated first, since it was the largest amount. It was anticipated that the loan accounts would be paid out of corporate earnings. At the time of incorporation all of the assets transferred from the *22 partnership to the corporation were necessary for the corporato operation. The stockholders intended to expand their business through acquiring additional machinery, hiring more tool makers, and making further tools and dies. It was not then possible for petitioner to liquidate his loan account balance without causing the corporation financial hardship. Rex Realty Corporation (hereinafter called Rex) was incorporated under the laws of Rhode Island on January 9, 1952 by petitioner and his two brothers. Each brother contributed $2,000 and received 100 shares of Rex capital stock. Rex purchased the premises to be occupied by the corporation on February 6, 1952 for $29,000, which sum was paid in cash. On March 28, 1952, Rex and the partnership executed a lease of the entire first floor of the premises, 369 Fountain Street, Providence, Rhode Island, requiring the partnership to make "all alterations and improvements in the premises so that the same will be fit for occupation by them, at no cost or charge to the Lessor." Thereafter the partnership made substantial improvements, costing $23,491.39, to the leased premises. On July 1, 1952, Rex and the corporation executed a new lease of *23 the entire premises. On July 17, 1952, Rex borrowed the sum of $25,000 from the Industrial National Bank of Providence. As security for the loan, Rex gave a first mortgage on the premises known as 369 Fountain Street, Providence, Rhode Island. Rex's purpose in borrowing was the purchase of land adjacent to 369 Fountain Street to be used as a parking lot by the corporation's employees. However, the contemplated purchase was not consummated at the time and Rex had on hand, and unused, the amount borrowed. Thereafter, on August 5, 1952, approximately one month after the corporation was activated, Rex loaned the corporation the sum of $23,000. The corporation borrowed the money from Rex to facilitate expansion. The loan was paid off by June 30, 1955. The following schedule reflects the assets, liabilities, capital accounts, gross receipts, and net income of the corporation for the fiscal years noted: Fiscal Year
6/30/53
6/30/54
6/30/55
6/30/56
6/30/57
6/30/58
Cash
$ 8,946
$ 8,410
$ 23,671
$ 3,357
$ 9,986
$ 9,427
Notes and accounts
50,814
54,795
61,988
68,809
85,466
61,833
receivable
Net depreciable assets
35,985
47,954
47,830
38,379
47,187
37,145
Inventories
$ 3,210
$ 5,735
$ 11,027
$ 33,216
$ 28,160
$ 32,228
Other assets
500
904
642
642
196
500
Cash S/V life insurance
2,146
5,077
Total assets
$ 99,455
$117,798
$145,158
$144,403
$173,141
$146,210
Accounts payable
18,007
18,518
41,403
28,629
27,344
15,826
Notes payable -
41,427
37,010
38,895
38,414
25,500
15,000
officers *
Notes payable - related
23,000
15,000
company **
Accrued expenses
2,080
21,761
21,931
20,507
47,045
24,117
Other liabilities
2,738
Total liabilities
$ 87,252
$ 92,289
$102,229
$ 87,550
$ 99,889
$ 54,943
Capital stock
10,000
10,000
10,000
10,000
10,000
10,000
Earned surplus
2,203
15,509
32,929
46,853
63,252
81,267
Gross receipts
300,356
346,978
426,889
504,038
523,817
509,270
Net income - including
55,251
76,800
82,886
82,787
104,404
113,606
officers' salaries
Net income
3,250
18,800
24,886
24,787
25,404
26,606
*24 No dividends were paid by the corporation for any of the fiscal years ending June 30, 1953 through June 30, 1958. As of July 1, 1952, the date on which the corporation was activated, and thereafter for the fiscal years ending June 30, 1953 to June 30, 1958, the loan accounts reflected additions (and withdrawals) as follows Fiscal year ending
Andrea
Petitioner
Joseph
Original allocation
$7,282.27
$23,587.26
$16,006.05
6/30/53
(3,804.87)
(2,372.46)
(1,071.32)
6/30/54
250.00
(1,340.14)
(1,727.43)
6/30/55
1,500.00
(150.00) *
500.00
6/30/56
0
(1,051.25)
570.00
6/30/57
(427.90)
(8,208.41)
(4,277.30)
6/30/58
0
(10,500.00)
0
Balance (as of 6/30/58)
$5,000.00
0 **
$10,000.00
From the inception of the corporation the loan accounts appeared on the balance *25 sheets and financial statements of the corporation as "Notes Payable - Officers." The corporation never issued any notes to the stock-holders, nor was any interest ever paid or accrued. The loan accounts were reflected as liability accounts in financial statements furnished by the corporation to Dun & Bradstreet, in the minutes of the annual meetings of the corporation, and in Schedule I. of the corporate Federal income tax returns. At the time of incorporation petitioner did not intend to demand payment on his loan account ahead of the corporation's outside creditors. The loan accounts have never been subordinated to any other indebtedness of the corporation, to claims of creditors, or for any other purpose. At the time of incorporation petitioner would have caused the corporation to borrow money to pay him off, if he had an immediate need for money. He had no intention of demanding payment on his loan account if doing so would cause the corporation to liquidate. The Jewelers Board of Trade (hereinafter referred to as the Board) is a trade agency, having one of its offices in Providence, Rhode Island. The Board's Confidential Rating Book dated September 1952 lists the partnership's *26 credit rating as J41, which is the highest credit standing. The Board asked the officers, as creditors, to subordinate their loans in order for the corporation to maintain the J41 rating. They refused to do so, and the corporate credit standing dropped. The Board's Confidential Rating Book dated March 1955 carries the name of the corporation but omits listing any credit standing. The total salaries paid to the officers during the fiscal year ended June 30, 1958, were as follows: Andrea
$35,000
Petitioner
26,000
Joseph
26,000 On April 30, 1958, the corporation issued a check to petitioner in the amount of $10,500, and a book entry was made reducing his loan account in that amount. Petitioner did not report this payment as income. In his deficiency notice, respondent determined that petitioner "received dividend income of $10,500.00 during 1958 from Salvadore Tool and Findings, Inc., that was not included in the taxable income reported on [his] return filed as required by Section 61 of the Internal Revenue Code of 1954." The payment of $10,500 from the corporation to petitioner in 1958 was a repayment of a loan, rather than a dividend *27 and is not taxable income to petitioner. Opinion In the case at bar all of the requirements of form necessary to make the transfer by petitioner of his $23,587.26 undistributed partnership profits an indebtedness of the corporation were met. It was either a debt and effective as such or purely formal and without substance. Whether the sum transferred gave rise to an indebtedness or to a proprietary interest depends upon the objective intent disclosed by all the pertinent factors in the case and not the formal manifestation of intent declared by the taxpayer. Isidor Dobkin, 15 T.C. 31, affd. 192 F. 2d 392. Cf. Wilshire & Western Sandwiches, Inc. v. Commissioner, 175 F. 2d 718. Respondent maintains that every substantive factor in the instant case supports the conclusion that there was no intent to create an indebtedness. But the record clearly establishes that at the time of the corporation's formation it was the desire and intention of the partners to loan to it a part of their undistributed profits. The subsequent actions of the parties and the treatment on the corporation's books are clearly consistent with the disclosed intent of the *28 parties. When the partnership assets were transferred to the corporation they were not sufficiently liquid to permit payment to the partners of these accumulated credit balances, which represented undistributed partnership profits built up over the years upon petitioner's share of which respondent does not deny income tax had already been paid once by petitioner as the income was earned. Had the partnership been able, prior to incorporation, to make a distribution of these accumulated and tax-paid earnings, petitioner would have had no taxable gain, cf. Louis Karsch, 8 T.C. 1327, 1330, 1331 (1947); Chris J. Sherlock, 34 T.C. 522, 525 (1960), affd. 294 F. 2d 863 (C.A. 5, 1961), certiorari denied 369 U.S. 802, and the corporation need have made no repayment. It was not lack of capital, but lack of cash, which caused the transaction to be handled as it was. Similarly, we find no basis for respondent's claim that the corporation was "thinly capitalized." Certainly a material amount of capital was invested in stock. [1] Moreover, no good reason has been suggested why a contributed capital sufficient for the partnership would not *29 be sufficient for the corporation. The corporation succeeded to a well established and very successful going concern. Its predecessor had been in operation 5 1/2 years and had reaped profits of more than $265,000. Its organizers anticipated a continuation of the large profits enjoyed by the partnership. There was neither change in the capital maintained by the partnership during its existence nor reason to suspect the need for any addition thereto in order to continue the existing business. Further, there was no need for a larger amount of cash on hand, as the corporation acquired all the cash of the partnership. Contrary to a claim by respondent, the record is completely devoid of any evidence which indicates that the $46,875.58 was a part of the contributed capital of the partnership rather than part of its working capital. No doubt *30 with ambitions to expand, the corporation could have used even more borrowed funds than those loaned by its affiliate. But the ratio of contributed capital to debts should be gauged by the requirements of the business then being carried on rather than by some future program. Cf. Swoby Corporation, 9 T.C. 887, 893 (1947); Hilbert L. Bair, 16 T.C. 90, 99 (1951), affd. 199 F. 2d 589 (C.A. 2, 1952); Isidor Dobkin, supra at p. 33. On the peculiar facts of this case, failure to charge the corporation interest on the loans seems to us to strengthen petitioner's position rather than the reverse. Had interest been paid, it must have had its source in corporate profits, and, while income to petitioner, it would have been deductible by the corporation and delayed repayment of the indebtedness. The fact that repayment of principal was actually made as soon as funds were available tends to support and further evidence the original intention. Lastly respondent relies upon the failure of the stockholder-creditors to demand payment of the debt in preference to the payment of other creditors. [2] The following language from Earle v. W. J. Jones & Son, 200 F. 2d 846, 850, *31 is particularly dispositive of this contention: * * * Certainly failure to attempt to collect a debt does not per se destroy its character as such; and the same strict insistence upon payment on the due date as would be the case if a bank were the creditor should not be expected where a shareholder, or one who is closely identified therewith, is a creditor. * * * While the existence of subsequently accumulated corporate profits may have placed the corporation in more liquid condition and made the repayments possible, these were in reality not a distribution of corporate but of partnership earnings attributable to the period before the corporation was born. Decision will be entered for the petitioners. Footnotes
*. This total has been stipulated. There is no explanation for the discrepancy from the figure of $6,998.↩
*. The difference from $58,475, the figure stipulated in the foregoing chart, is accounted for by minor adjustments.↩
*. These accounts were reported on the corporations income tax returns (Schedule L - Balance Sheets) as "Bonds, notes, and mortgages payable (maturing less than one year from date of balance sheet)." ↩
**. No note executed or interest paid thereon.↩
*. Stipulated figure. The petition gives the figure as $115.00. ↩
**. The $35.00 discrepancy is explained in preceding footnote.↩
1. Nominally the ratio of capital to debt was 1 to 4 1/2. Considering the unlisted contributed assets. it was probably closer to 1 to 2. See, e.g., John Kelley Co. v. Commissioner, 326 U.S. 521 (1946); Ruspyn Corporation, 18 T.C. 769, 778 (1952); Earle v. W. J. Jones & Son, 200 F. 2d 846, 850↩ (C.A. 9, 1952).
2. But, as our findings show, the indebtedness was maintained on the books even though it adversely affected the corporation's credit rating.↩