Mason-Dixon Sand and Gravel Company, et al. [1] v. Commissioner. Mason-Dixon Sand & Gravel Co. v. Commissioner
Docket Nos. 84194, 85099, 85100.
United States Tax Court
T.C. Memo 1961-259; 1961 Tax Ct. Memo LEXIS 90; 20 T.C.M. (CCH) 1351; T.C.M. (RIA) 61259; September 15, 1961
*90 1. Held, certain interest-bearing promissory notes, issued in 1953 and 1954 by petitioner corporation to its stockholders and to another individual who later became a stockholder, for cash advances to the corporation, constituted bona fide indebtedness, and interest paid with respect thereto is deductible. Held, further, the payment in 1955 by the corporation of the principal amounts of the notes did not constitute the receipt of taxable dividends in the hands of the payees. 2. Held, respondent erred in determining that petitioner corporation had an inventory on hand at March 31, 1954, and March 31, 1955, of $5,000 and $20,000, respectively. Robert P. Smith, Esq., 815 15th St., Washington, D.C., and Joseph W. Kiernan, Esq., for the petitioners. Herbert A. Seidman, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income tax against petitioners as follows: Docket
Taxable Year
Petitioner
No.
Ended:
Deficiency
Mason-Dixon Sand and Gravel Company
84194
Mar. 31, 1955
$17,632.39
Mason-Dixon Sand and Gravel Company
84194
Mar. 31, 1956
1,270.42
Calvin R. and Rebecca Myers
85099
Dec. 31, 1955
16,078.31
John A. and Madelene F. Neill
85100
Dec. 31, 1955
8,252.18
The *91 case of the corporate petitioner, hereinafter sometimes referred to as Mason-Dixon, involves three issues: (1) the deductibility, under section 23(b), I.R.C. 1939, and section 163(a), I.R.C. 1954, of interest paid by Mason-Dixon in each of the taxable periods or years ended March 31, 1954, through March 31, 1956, upon its promissory notes: (2) the existence or nonexistence of inventories on hand at March 31, 1954, and March 31, 1955; and (3) the correct amount of a net operating loss carryover from the taxable period ended March 31, 1954, to the taxable year ended March 31, 1955, which issue will be resolved by the determination made by this Court of the aforesaid interest deduction and inventory issues. The cases of the individual petitioners (husbands only), hereinafter sometimes referred to as petitioners or as Myers and Neill, involve the single question of whether or not the repayment to them by Mason-Dixon of the principal amounts of its promissory notes constituted dividends, as determined by the respondent, or merely the repayment of loans, as contended for by petitioners. Findings of Fact The stipulated facts are so found and are incorporated herein by reference. Petitioner, *92 Mason-Dixon Sand and Gravel Company, is a corporation organized under the laws of the State of Maryland, with its principal place of business at Perryville, Maryland. It filed U.S. corporation income tax returns for the period May 22, 1953, to March 31, 1954, and for the fiscal years ended March 31, 1955, and 1956 with the district director of internal revenue at Baltimore, Maryland. Petitioners Calvin R. and Rebecca Myers are husband and wife residing in Lewistown, Pennsylvania. They filed a joint U.S. individual income tax return for the calendar year 1955 with the district director of internal revenue at Philadelphia. Petitioners John A. and Madelene F. Neill are husband and wife residing in Lewistown, Pennsylvania. They filed a joint U.S. individual income tax return for the calendar year 1955 with the district director of internal revenue at Philidelphia. On May 29, 1952, the individual petitioners (husbands only), for themselves and as agent for Paul A. Sierer, acquired as an investment title to approximately 320 acres of timberland in Cecil County, Maryland, from the Wagman family (trading as the Wagman Land Company), consisting of 11 children, each of whom owned a 1/11th interest *93 in the property. The purchase price was $30,000. The land had about a 2,000-foot frontage on U.S. Route 40. In April 1953 the State of Maryland purchased three acres of this property for right-of-way purposes for which it paid $9,900. On May 22, 1953, articles of incorporation of the Mason-Dixon Sand and Gravel Company were issued and authorized by the State Tax Commission of the State of Maryland, with an authorized capital stock of 25,000 shares of common stock, par value $1 per share. On June 5, 1953, title to the realty (approximately 317 acres) owned by Sierer and the individual petitioners was transferred to Mason-Dixon, for which each of the owners received 7,569 shares of common stock, representing the original cost of the property, plus carrying charges, less the amount of $9,900 received from the State of Maryland for the three acres taken by the State Highway Department for right-of-way purposes. As of June 5, 1953, the outstanding capital stock of Mason-Dixon was owned as follows: Percent-
age of
Outstand-
Stockholder
Shares
Cost
ing Stock
Paul A. Sierer
7,569
$ 7,569
33 1/3
Calvin R. Myers
7,569
7,569
33 1/3
John A. Neill
7,569
7,569
33 1/3
22,707
$22,707
100 Prior to May 29, 1952, Sierer *94 had been interested in a logging operation then being conducted on the 320-acre tract and had contacted Myers and Neill for the purpose of getting them interested in acquiring the property as an investment. They made two or three trips to look over the property and, in the course of these trips, Myers, who was a civil engineer by profession and formerly an engineer with the Pennsylvania Department of Highways, noted the presence of sand and gravel in various locations throughout the tract where the trees had been felled and alongside the timber paths. However, no extensive exploration was conducted prior to May 29, 1952, to ascertain the extent, quantity, or quality of the sand and gravel deposit contained in the tract. After the acquisition of the 320-acre tract, Myers, with the use of a drilling rig, conducted an extensive operation on the acreage in order to ascertain the extent, quantity, and quality of the sand and gravel deposit contained in the property. This exploration was conducted in March 1953 and consisted in the drilling of test holes at eight locations throughout the area, selected so as to get a representative sample of the entire tract. Samples of the material from *95 the eight test holes were taken at 5-foot intervals to a depth of 60 feet. The samples were then submitted to Pennsylvania State College for a grading analysis which resulted in the determination that the sand and gravel met the specifications for highway and bridge construction work established by the Pennsylvania Department of Highways. Favorable tests were also made of the materials by the highway departments of Maryland and Delaware and the United States engineers. Based upon this extensive exploration, Myers determined that the 320-acre tract contained a deposit, at an average depth of 25 feet, of from 11,979,000 to 14,137,600 tons of high-grade sand and gravel. Myers ascertained that there was a market within a radius of 80 miles of the site for about 400,000 tons of sand and gravel per year, as well as a market for the summer and fall of 1953 of approximately 200,000 tons. On the basis of the prevailing royalty rate for sand and gravel in that area at that time of 5 cents per ton, Myers determined that the present value of the tract was somewhere between $255,520.10 and $353,444, and that an operator could be expected to make a profit of from 25 to 30 cents per ton on the basis *96 of an expected sale price of sand and gravel f.o.b. the plant of an average of $1 per ton. Later in 1954 and 1955 the actual profit of Mason-Dixon was about 40 cents per ton. All of this extensive exploration was made prior to the sale of the three acres to the State of Maryland at a price of $3,300 per acre and prior to the incorporation of Mason-Dixon. Also, prior to incorporation Sierer, Myers, and Neill had been offered $65,000 for the tract by a local operator, Lester Davis, but the offer was turned down as the three owners had concluded to incorporate and operate the property as a sand and gravel business. Prior to incorporation Sierer, Myers, and Neill had secured a proposal from Capitol Equipment Co., Inc., for the construction and installation by July 1953 of machinery and equipment for a complete sand and gravel plant at a cost of approximately $45,000. It was the intention of the three incorporators to pay for the machinery and equipment necessary to place the plant in production out of sales of sand and gravel which they reasonably estimated could be made during the summer and fall months of 1953. All other machinery and equipment suppliers likewise had promised and assured *97 the incorporators that their sand and gravel plant could be in full production not later than July 1953. Through no fault of Mason-Dixon, the machinery and equipment were not shipped as promised, with the consequence that the plant was not fully completed and in operation until March 1954, after the summer and fall season of 1953 had closed. Mason-Dixon had agreed to pay for the machinery and equipment on a monthly basis. With the loss of the expected summer and fall business of 1953, Mason-Dixon was forced to borrow funds, as hereinafter indicated, in order to meet the monthly payments for the machinery and equipment. At all times material to this proceeding, Sierer, Myers, and Neill were directors of Mason-Dixon. At the organization meeting of Mason-Dixon held on June 5, 1953, Sierer was elected president of Mason-Dixon, Myers vice president, and Neill secretary-treasurer. Prior to incorporation, Sierer, Myers, and Neill had ordered and obligated themselves to purchase certain machinery and equipment and had individually advanced for such purposes the sums of $3,287.84, $9,454.31, and $5,762.30, respectively. At the organization meeting of Mason-Dixon held on June 5, 1953, such purchases *98 were ratified and approved and promissory notes due in one year, with interest at 6 percent, were executed and delivered to the three incorporators for the above-mentioned advances. On June 5, 1953, the stock ownership and notes to stockholders of Mason-Dixon were as follows: Stock Ownership
Notes
Stockholder
Shares
Percent
Amount
Percent
Paul A. Sierer
7,569
33 1/3
$ 3,287.84
17.77
Calvin R. Myers
7,569
33 1/3
9,454.31
51.09
John A. Neill
7,569
33 1/3
5,762.30
31.14
Total
22,707
100
$18,504.45
100
On June 22, 1953, Sierer and Myers made additional advances to Mason-Dixon of $17,488.05 and $5,000, respectively, and received from Mason-Dixon promissory notes due in one year, with interest at 6 percent. These loans increased the total notes to stockholders of Mason-Dixon and revised the percentage owing to each stockholder as follows: Amount of
Percent-
Stockholder
Notes
age
Paul A. Sierer
$20,775.89
50.68
Calvin R. Myers
14,454.31
35.26
John A. Neill
5,762.30
14.06
$40,992.50
100
On July 25, 1953, Mason-Dixon issued to Joann Sierer, daughter of Paul A. Sierer, 2,293 shares of common stock, for which Mason-Dixon received $2,293 in cash. Also, on July 25, 1953, Sierer (Paul A.), Myers, and Neill made additional advances to Mason-Dixon *99 of $12,362.11, $10,976.69 and $19,668.70, respectively, and received from Mason-Dixon promissory notes due in one year, with interest at 6 percent. Stock ownership and notes to stockholders of Mason-Dixon then stood as follows: Stock Ownership
Notes
Stockholder
Shares
Percent
Amount
Percent
Paul A. Sierer
7,569
30.276
$33,138
39.450
Calvin R. Myers
7,569
30.276
25,431
30.275
John A. Neill
7,569
30.276
25,431
30.275
Joann Sierer
2,293
9.172
None
None
25,000
100%
$84,000
100%
On October 29, 1953, George F. Wagman, Jr., who had not yet become a stockholder of Mason-Dixon, turned over to Mason-Dixon $5,000, and Mason-Dixon issued to him its promissory note due in one year for $5,000 bearing interest at 6 percent. Also, on October 29, 1953, Sierer (Paul A) and Myers made additional advances to Mason-Dixon of $3,500 each and received from Mason-Dixon promissory notes due in one year, with interest at 6 percent. On December 16, 1953, Sierer (Paul A.) and Myers made additional advances to Mason-Dixon of $2,000 each and received from Mason-Dixon promissory notes due in one year, with interest at 6 percent. On December 31, 1953, Myers made an additional advance to Mason-Dixon of $5,000 and received from Mason-Dixon a promissory *100 note due in one year, with interest at 6 percent. On January 8, 1954, Sierer (Paul A.) made an additional advance to Mason-Dixon of $8,894.84 and received from Mason-Dixon a promissory note due in one year, with interest at 6 percent. On January 9, 1954, [2] Mason-Dixon's authorized capital stock was increased to 40,000 shares of a par value of $1 per share, leaving 15,000 shares of authorized but unissued stock. On February 10, 1954, Sierer (Paul A.) made an additional advance to Mason-Dixon of $1,100 and received from Mason-Dixon a promissory note due in one year, with interest at 6 percent. On February 17, 1954, Myers made an additional advance to Mason-Dixon of $2,500 and received from Mason-Dixon a promissory note due in one year, with interest at 6 percent. On March 11, 1954, Wagman, who had not yet become a stockholder of Mason-Dixon, turned over to Mason-Dixon $10,413, and Mason-Dixon issued to him its promissory note due in one year for $10,413, bearing interest at 6 percent. On March 11, 1954, the stock ownership and notes to stockholders of Mason-Dixon and Wagman were as follows: Stock Ownership
Notes
Stockholder
Shares
Percent
Amount
Percent
Paul A. Sierer
7,569
30.276
$ 48,632.84
38.022
Calvin R. Myers
7,569
30.276
38,431.00
30.046
John A. Neill
7,569
30.276
25,431.00
19.882
Joann Sierer
2,293
9,172
None
None
George F. Wagman, Jr.
None
None
15,413.00
12.050
25,000
100%
$127,907.84
100%
On *101 March 13, 1954, Mason-Dixon issued to Wagman 4,587 shares of its capital stock for which he paid $1 per share, and Wagman was thereupon elected to serve on the board of directors of Mason-Dixon. Also, on March 13, 1954, Sierer (Paul A.) acquired 4,587 additional shares of Mason-Dixon and, on April 16, 1954, Myers acquired 2,982 additional shares for which they each paid $1 per share. Although the notes issued to the stockholders of Mason-Dixon were to be paid within one year, the only payment by Mason-Dixon during 1954 was made to Myers prior to June 30, 1954, in the amount of $3,000. Therefore, as of June 30, 1954, the books of Mason-Dixon showed the stock ownership and notes payable to stockholders to be as follows: Stock Ownership
Notes Payable
Stockholder
Shares
Percent
Amount
Percent
Paul A. Sierer
12,156
32.716
$ 48,632.84
38.935
Calvin R. Myers
10,551
28.397
35,431.00
28.366
John A. Neill
7,569
20,371
25,431.00
20.360
Joann Sierer
2,293
6.171
None
None
George F. Wagman, Jr.
4,587
12.345
15,413.00
12.339
37,156
100%
$124,907.84
100%
During 1955 Mason-Dixon paid all of the above-mentioned notes payable to its stockholders in the total amount of $124,907.84 on three different dates and in amounts as follows: Stockholder
May 23, 1955
Aug. 18, 1955
Oct. 1, 1955
Paul A. Sierer
$19,488.05
$15,001.49
$14,143.30
Calvin R. Myers
14,454.31
10,976.69
10,000.00
John A. Neill
10,431.00
7,500.00
7,500.00
George Wagman, Jr.
6,413.00
4,500.00
4,500.00
Total
$50,786.36
$37,978.18
$36,143.30
During *102 the years ended March 31, 1954, 1955, and 1956, Mason-Dixon paid to its stockholders on account of its aforesaid promissory notes, and claimed as interest deductions on its Federal income tax returns for said years, the following amounts which the stockholders reported on their Federal income tax returns as interest received from Mason-Dixon: Amount
Year Ended
Deducted
March 31, 1954
$4,318.19
March 31, 1955
7,463.72
March 31, 1956
2,568.04
Although it was originally estimated that the machinery and equipment for a complete sand and gravel plant for Mason-Dixon would cost about $45,000, it actually cost over $183,000. For the taxable year ended March 31, 1955, Mason-Dixon reported a taxable net income, after deducting the net operating loss carryover from the period ending March 31, 1954, of $17,876.03, of $107,606.25 and, for the taxable year ended March 31, 1956, Mason-Dixon reported a taxable net income of $184,530.36. The respondent made adjustments to the taxable income reported as follows: Year
Year
Ended
Ended
Mar. 31,
Mar. 31,
1955
1956
Taxable income re-
ported
$107,606.25
$184,530.36
Net loss carryover dis-
allowed
9,318.19
Inventory
15,000.00
Interest
7,463.72
2,568.04
Repairs *
2,249.18
Miscellaneous *
22.00
100.00
Additional deduction *
(144.64)
(224.91)
Taxable income cor-
rected
$141,514.70
$186,973.49
*103 The net loss carryover disallowed of $9,318.19 consisted of two items: (1) the disallowance of the interest claimed for the period ended March 31, 1954, of $4,318.19, and (2) an inventory adjustment made by the respondent of $5,000. In a statement attached to the deficiency notice to Mason-Dixon, the respondent explained the adjustments made by him in part as follows: It is held that the amounts set forth below for the years indicated, which you had claimed as deductions for interest on notes payable held by your stockholders on the returns filed for the years ended March 31, 1954, March 31, 1955 and March 31, 1956, are not deductible under section 23(b) of the Internal Revenue Code of 1939 or the corresponding section 163 of the Internal Revenue Code of 1954, inasmuch as the alleged loans from your stockholders do not constitute indebtedness. In computing your taxable income for the years ended March 31, 1954 and March 31, 1955 you failed to take into account inventories on hand at March 31, 1954 in the amount of $5,000.00 and inventories on hand at March 31, 1955 in the amount of $20,000.00. In view of this failure your income for the year ended March 31, *104 1954 has been understated by $5,000.00 and your taxable income for the year ended March 31, 1955 has been understated by $15,000.00. In the joint return filed by Myers and his wife for the calendar year 1955 they reported a taxable income of $17,449.07. The respondent increased this by "(a) Dividend income $35,431.00" with this explanation: (a) On your return filed for the year 1955 you failed to include the sum of $35,431.00 received from the Mason-Dixon Sand and Gravel Company, Perryville, Maryland, during the course of that year. The amount of $35,431.00 is held to constitute dividends within the meaning of section 316 of the Internal Revenue Code of 1954, and therefore is taxable income for the year 1955 under section 63(a) of the Internal Revenue Code of 1954. In the joint return filed by Neill and his wife for the calendar year 1955 they reported a taxable income of $6,825.69. The respondent increased this by "(a) Dividend income $25,431.00" with an explanation similar to the one he gave in the Myers determination. The notes given by Mason-Dixon to its stockholders and to Wagman before he became a stockholder, in return for the moneys advanced in the total amount of $127,907.84, *105 constituted a bona fide indebtedness of Mason-Dixon to the noteholders. The payments of $4,318.19 in the period ended March 31, 1954, and of $7,463.72 and $2,568.04 in the fiscal years ended March 31, 1955, and March 31, 1956, respectively, constituted payments by Mason-Dixon of genuine interest on genuine indebtedness; and the payments to Myers and Neill in 1955 of a total of $35,431 and $25,431, respectively, constituted the repayment by Mason-Dixon of borrowed money and not the distribution of a taxable dividend. Mason-Dixon never carried an inventory of sand and gravel on its books. In fact, it had no inventory of sand and gravel on hand on March 31, 1954, March 31, 1955, or March 31, 1956. The respondent determined that Mason-Dixon did have an inventory of $5,000 on March 31, 1954, and had therefore understated its income for the period ending March 31, 1954, by $5,000. The respondent further determined that Mason-Dixon did have an inventory of $20.000 on March 31, 1955, and had therefore understated its income for the year ended March 31, 1955, by the difference between the closing inventory of $20,000 and the opening inventory of $5,000, or by $15,000. These determinations of *106 the respondent regarding inventory were in error. The respondent made no determination regarding inventory adjustments for the fiscal year ending March 31, 1956. Mason-Dixon sold its sand and gravel deposit in September 1958 for $420,000 after extracting approximately 2,000,000 tons of sand and gravel from the deposit between 1954 and 1958. The price of sand and gravel had not materially changed between 1953 and 1958 when the plant was sold. In the sale of Mason-Dixon's sand and gravel plant in 1958, no inventory whatsoever was included as an item of property transferred. Opinion The principal issue is whether the cash advances in the total amount of $127,907.84, made to Mason-Dixon by its stockholders and by Wagman before he became a stockholder, constituted "indebtedness" as that term is used in section 23(b), [3] I.R.C. 1939, and section 163(a), [4] I.R.C. 1954, or whether such advances were, in substance, contributions to capital as determined by the respondent. This is essentially a question of ultimate fact. Matthiessen v. Commissioner, 194 F. 2d 659 (C.A. 2, 1952), affirming, 16 T.C. 781; Gooding Amusement Co., 23 T.C. 408, 418, affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari *107 denied, 352 U.S. 1031. In making this ultimate finding, no one criterion can be said to be decisive. John Kelley Co. v. Commissioner, 326 U.S. 521. We have found as an ultimate fact that the advances constituted genuine indebtedness. We have made this ultimate finding because we believe the evidentiary facts and the inferences to be drawn therefrom clearly show that the advances were intended by all parties concerned to represent, and did in fact represent, a bona fide debtor-creditor relationship between the parties who made the advances and Mason-Dixon. Promissory notes due in one year, with interest at 6 percent, were executed by Mason-Dixon for the advances. The notes were all paid in full, with interest, not later than October 1, 1955, and were at all times treated as indebtedness (notes payable) on the books and tax returns of Mason-Dixon. *108 Respondent's principal contention is that Mason-Dixon was undercapitalized in that it commenced operations with no working capital or paid-in surplus, and that the advances were used by the corporation to acquire the necessary machinery and equipment to begin operations. This is definitely not a case of a corporation with a thin capitalization, and is not within the ambit of such cases cited by the respondent, as R. M. Gunn, 25 T.C. 424, affirmed per curiam Sub nom. Perrault v. Commissioner, 244 F. 2d 408 (C.A. 10, 1957); Emanuel N. (Manny) Kolkey, 27 T.C. 37, affd. 254 F. 2d 51 (C.A. 7, 1958); and U.S. Asiatic Co., 30 T.C. 1373. In those cases the ratio of claimed indebtedness to the respective corporation's equity capital was about 11 to 1 in Gunn, 4,000 to 1 in Kolkey, and from 64 to 1 at the end of the year 1948 to 71 to 1 at the end of the years 1950 and 1951 in Asiatic. In the instant case, if the 317 acres be considered (as we think they should be) [5] *110 at their real value of at least $255,500, the ratio of indebtedness to equity capital is about 1/2 to 1 or 1 to 2, that is, one part indebtedness to two parts of equity capital. A case in point is Earle v. W. J. Jones & Son. *109 [5] In that case certain mining property paid in to a corporation as a capital contribution "was conservatively estimated to be at least $50,000 in excess of its purchase price" of $40,000. For the purpose of exploiting the mining property, the stockholders of the corporation made large advances, totaling $317,106. The capital stock of the corporation was approximately $1,000. In holding that the corporation was not one with a thin capitalization, the court said in part: Appellants [the United States] also contend that this is a case of a corporate financial structure so overbalanced by indebtedness that it is lacking in substance for recognition for tax purposes. Considering (as we think it should be considered) the mine property as a part of capital, the ratio of debt to capital, after all advances had been made, and taking the most conservative estimate of the value of the mine property at the time of incorporation, was about six to one. We are not at all certain that such a financial structure is lacking in substance for recognition for tax purposes. Certainly there were "material amounts of capital" invested in stock. * * * We think, when consideration is given (as it must be) to the very valuable sand and gravel deposit contained in the 317 acres paid in by the incorporators of Mason-Dixon for its capital stock, there were material amounts of equity capital invested in stock. The cases relied upon by the respondent are ones in which the equity investment was nominal and there was present an excessive debt structure. See Sheldon Tauber, 24 T.C. 179; and Ainslie Perrault, 25 T.C. 439, affd. 244 F. 2d 408 (C.A. 10, 1957). The respondent also relies heavily upon the factor that the advances were made by the stockholders of Mason-Dixon in proportion to their stock ownership. This is only partially true. The original advances were not in proportion to stock ownership. Originally the three stockholders each owned one-third of the stock but made advances in the proportion of 17.77 percent, 51.09 percent and 31.14 percent, respectively. Additional advances were made which changed the proportion to 50.68 percent, 35.26 percent and 14.06 percent, respectively. It was not until $84,000 of advances had been made that the advances were in proportion to their stock ownership, and this is true only if the *111 2,293 shares owned by Joann Sierer be considered as in substance owned by her father. Then followed a series of advances between October 29, 1953, and March 11, 1954, when the advances were again out of proportion to the stock owned. By that time all the advances had been made and, adding Joann's stock to that of her father's, the proportions were as follows: Propor-
Propor-
tion of
tion of
Stockholder
Stock
Notes
Paul A. Sierer
39.448%
38.022%
Calvin R. Myers
30.276%
30.046%
John A. Neill
30.276%
19.882%
George F. Wagman, Jr.
None
12.050%
Total
100%
100% Thereafter, additional stock was issued for cash to certain of the stockholders and to Wagman, which, by June 30, 1954, brought both the stock and the notes into substantially the same proportion of ownership. While this is a criterion to be considered, we do not regard it as decisive. We think it is outweighed by other factors such as the real intentions of the parties to create a valid, bona fide debtor-creditor relationship, the issuance of interest-bearing promissory notes, and the substantial amount of capital invested in stock. Cf. Earle v. W. J. Jones & Son, supra, wherein the court also said: Where purported loans are made in proportion to stockholdings *112 the transaction is subject to close scrutiny, but this circumstance is certainly not in itself conclusive that the advances are capital contributions. We agree with the respondent that the substance rather than the form of a transaction is controlling. Gregory v. Helvering, 293 U.S. 465; Commissioner v. Court Holding Co., 324 U.S. 331. But when substance and form coincide, as they demonstrably do in the instant case, there is no problem. Byerlite Corp. v. Williams, 286 F. 2d 285 (C.A. 6, 1960). We conclude as to this issue that the promissory notes issued by Mason-Dixon evidenced valid indebtedness giving rise to a bona fide debtor-creditor relationship. The interest paid on the notes is therefore deductible, and the repayments thereof in 1955 did not constitute dividend distributions with respect to Mason-Dixon's stock but merely the repayment of loans giving rise to no income. Respondent's determination of the inventory matter is wholly lacking in merit for the simple reason that the evidence shows that on March 31, 1954, and March 31, 1955, Mason-Dixon had no inventory of sand or gravel on hand other than the large raw deposit of over 11,000,000 tons contained in the 317-acre *113 tract. Its policy was to excavate and process the sand and gravel as it was being sold. The respondent determined that at the end of the period May 22, 1953, to March 31, 1954, Mason-Dixon had a sand and gravel inventory of $5,000. For the fiscal year ended March 31, 1955, he determined that Mason-Dixon had a closing inventory of sand and gravel of $20,000. He made no determination of a closing inventory for the fiscal year ended March 31, 1956, but accepted the return of Mason-Dixon showing no inventory at that time. Because of these adjustments, the respondent increased Mason-Dixon's income (or, rather, decreased its loss) by $5,000 for the period ended March 31, 1954, and increased the corporation's income for the fiscal year ended March 31, 1955, by $15,000, the difference between the so-called opening and closing inventories for that year. In view of our finding that Mason-Dixon had no inventory of sand and gravel on hand on March 31, 1954, or March 31, 1955, we hold that the inventory adjustments made by the respondent are in error. Because of the uncontested adjustments, Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith for the purposes of this report: Calvin R. Myers and Rebecca Myers, Docket No. 85099, and John A. Neill and Madelene F. Neill, Docket No. 85100.↩
2. Erroneously stipulated as 1953. See Exhibit JJ.↩
*. Items not contested here.↩
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(b) Interest. - All interest paid or accrued within the taxable year on indebtedness * * *. ↩
4. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
5. See Earle v. W. J. Jones & Son, 200 F. 2d 846 (C.A. 9, 1952).