Scotland Mills, Inc. v. Commissioner. Edinburgh Corporation v. Commissioner.
Scotland Mills, Inc. v. Commissioner
Docket Nos. 90139, 90148.
United States Tax Court
T.C. Memo 1965-48; 1965 Tax Ct. Memo LEXIS 282; 24 T.C.M. (CCH) 265; T.C.M. (RIA) 65048; March 5, 1965
*282 Richard E. Thigpen, 129 W. Trade St., Charlotte, N.C., and Richard E. Thigpen, Jr., for the petitioners. Wallace E. Whitmore, and John L. Ridenour, III, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent determined deficiencies in the income taxes of the petitioners as follows: Scotland Mills, Inc.
Year Ended
Income Tax
June 30, 1957
$130,455.57
June 30, 1958
19,202.37
Edinburgh Corporation
August 31, 1954
$ 4,780.52
August 31, 1957
419.12
August 31, 1958
(37.26)
August 31, 1959
122.25
The first issue for decision is whether certain net advances made by Scotland Mills, Inc., (hereinafter referred to as Scotland) to Tuftwick Corporation (hereinafter referred to as Tuftwick) created a bona fide indebtedness or amounted to a contribution to capital. Dependent upon this is the right of Scotland to bad debt deductions for its fiscal years ending June 30, 1957 and June 30, 1958, in the respective amounts of $250,876.09 and $36,927.64. The respondent also denied treatment as an indebtedness to the net advances made by Edinburgh Corporation (hereinafter referred to as Edinburgh) *283 to Tuftwick from September 1, 1952 to August 31, 1956. The nature of these advances will determine Edinburgh's right to a bad debt deduction for its fiscal years ending August 31, 1956 to August 31, 1959, inclusive. Edinburgh's fiscal year ending August 31, 1956, is involved only because the amount of net operating loss carry back from that year to fiscal 1954 is in controversy. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Petitioner, Scotland, was organized in 1939 under the laws of the State of North Carolina and operates at Laurinburg, North Carolina. The company is engaged in the business of manufacturing and selling textiles and related products such as wide sheeting for bedspreads, cotton yarns, bedspreads and carpetings. Scotland filed its Federal income tax returns for the years in question with the district director of internal revenue at Greensboro, North Carolina. Edinburgh filed its Federal income tax returns for the years in question with the district director of internal revenue at Greensboro, North Carolina. Petitioner, Edinburgh, was also incorporated in 1939 in North Carolina and does business at Laurinburg. *284 The firm is engaged in the manufacturing and selling of textiles and related products. At all times material to this case the majority of Scotland's capital stock was held by Halbert M. Jones, Edwin Morgan and corporations owned or controlled by them. The majority of the capital stock of Edinburgh was owned by Edwin Morgan. In 1940 Jacques M. Schloss organized the Sun Spun Chenille Corporation (hereinafter referred to as Sun Spun) to manufacture chenille bedspreads. The sales of Sun Spun were handled by a selling agent, Balchman & Schloss, which firm was also used as a selling agent by Scotland. After several years of profitable operations Sun Spun was sold to Burlington Mills at a profit. Because of his success with Sun Spun, Schloss was able to interest Morgan and Jones in the possibility of organizing a new selling agent and a new company to manufacture chenille bedspreads. The three men were instrumental in organizing Tuftwick and Morgan-Jones, Inc. (hereinafter referred to as Morgan-Jones). Morgan-Jones became the selling agent for both Scotland and Tuftwick. Scotland was mainly interested in supplying materials to Tuftwick. Tuftwick as a chenille bedspread manufacturer *285 was a customer for the wide sheeting produced by Scotland; and, as the manufacturer of tufted chenille bedspreads, Tuftwick broadened the line of merchandise offered through Morgan-Jones. In addition Tuftwick gave its owners a chance for an equity interest in what they hoped would be a profitable company. Morgan-Jones was organized in 1946 with paid-in capital of $36,000. It became the selling agent for both Scotland and Tuftwick. Scotland invested $20,000 in the capital stock of Morgan-Jones. The stockholders of Morgan-Jones were Scotland, Schloss, A. B. Dennison and Morgan Cotton Mills. Tuftwick was incorporated under the laws of the State of North Carolina on October 15, 1946, to manufacture bedspreads and other textile products. Upon incorporation Tuftwick's management was as follows: Jacques M. Schloss, director and president; A. B. Dennison, director and vice president; L. S. Woodson, director and secretary-treasurer; Edwin Morgan, director; and Halbert M. Jones, director. Tuftwick's authorized capital was 2,000 shares of preferred stock of the par value of $100 per share and 1,000 shares of common stock without par value. At the time of incorporation one share of Tuftwick *286 common stock was issued to each of the following: Scotland, Edwin Morgan, Halbert M. Jones, J. M. Schloss, Mary T. Schloss, L. S. Woodson, Maude K. Woodson, and A. B. Dennison. By July 31, 1947, Tuftwick had issued and outstanding 750 shares of common stock for which $75,000 was credited to capital and $75,000 was credited to paid-in surplus. This stock was held as follows: Scotland
298
J. M. Schloss
261 1/2
Mary T. Schloss
1
L. S. and Maude K. Woodson
112 1/2
A. B. Dennison
75
Halbert M. Jones
1
Edwin Morgan
1
750 At this time Scotland owned 40 percent of Tuftwick's common stock. In succeeding years Scotland made purchases of Tuftwick stock from individuals as follows: August 31, 1948
L. S. Woodson 112.5 shares common for
$9,000.00
January 6, 1953
A. B. Dennison 50 shares preferred for
25.00
January 19, 1953
A. B. Dennison 75 shares common for
37.50
January 19, 1953
J. M. Schloss 262.5 shares common for
131.25
In payment for the 298 shares of common stock issued to Scotland and the one share each issued to Jones and Morgan $60,000 was credited to the Tuftwick account on the books of Scotland on August 30, 1947. At the *287 time this credit was made on the books of Scotland, Tuftwick had been operating for 10 months. During the first 9 months of Tuftwick's operation, Scotland advanced to it $48,088 in cash, but these cash advances were not in payment for the stock. On March 23, 1948, 200 shares of Tuftwick's preferred stock was issued to Scotland and in payment therefor $20,000 was credited to Tuftwick's account on Scotland's books. At July 31, 1950, an additional 75 shares of such stock was issued to Scotland and $7,500 was credited therefor to the said Tuftwick account. Scotland did not advance cash to Tuftwick in connection with either purchase. At the close of its first 9 months of operation, Tuftwick had cash, receivables, inventories, fixed assets, leasehold improvements and other assets amounting to $154,767.44. During these first 9 months Tuftwick sustained an operating loss of $85,588.41. In 1947 Edinburgh started renting machinery to Tuftwick, but its dealings with Tuftwick were quite modest when compared with those of Scotland. The accounts receivable from Tuftwick, as shown in Edinburgh's books, cover the period from August 31, 1947 to August 31, 1959. The account is mainly concerned *288 with Tuftwick's rental of production machinery and buildings from Edinburgh, but it also reflects that Edinburgh made cash advancements to Tuftwick, and made certain interest and principal payments on Tuftwick's bank loans. The open account that Tuftwick maintained with Scotland follows: Year Ending
Debits
Credits
Net Change
Balance
8-31-47
Cash
$ 48,088.17
Materials & other charges
121,052.29
Cash paid on account
$ 31,147.73
Capital stock
60,000.00
Other credits
10,964.77
$169,140.46
$102,112.05
$ 67,028.41
8-31-48
Cash
0
Materials & other charges
$244,643.45
Cash paid on account
$196,304.96
Capital stock
20,000.00
Other credits
9,622.04
$244,643.45
$225,927.00
$ 18,716.45
$ 85,744.86
8-31-49
Cash
$ 3,000.00
Materials & other charges
143,279.98
Cash paid on account
$ 62,614.14
Other credits
3,163.46
$146,279.98
$ 65,777.60
$ 80,502.38
$166,247.24
8-31-50
Cash
0
Materials & other charges
$153,673.49
Cash paid on account
$117,556.47
Other credits
7,367.51
$153,673.49
$124,923.98
$ 28,749.51
$194,996.75
8-31-51
Cash
$ 61,883.65
Materials & other charges
90,941.09
Cash paid on account
$ 7,936.72
Other credits
151,718.93
$152,824.74
$159,655.65
($ 6,830.91)
$188,165.84
8-31-52
Cash
0
Materials & other charges
$182,588.07
Cash paid on account
$118,572.33
Other credits
41,149.22
$182,588.07
$159,721.55
$ 22,866.52
$211,032.36
8-31-53
Cash
0
Materials & other charges
$123,581.84
Cash paid on account
$ 87,469.17
Other credits
1,502.96
$123,581.84
$ 88,972.13
$ 34,609.71
$245,642.07
8-31-54
Cash
$ 17,683.31
Materials & other charges
14,336.08
Cash paid on account
$ 14,575.12
Other credits
3,284.42
$ 32,019.39
$ 17,859.54
$ 14,159.85
$259,801.92
8-31-55
Cash
$ 85,588.60
Materials & other charges
16,091.68
Cash paid on account
$ 15,000.00
Other credits
35,578.52
$101,680.28
$ 50,578.52
$ 51,101.76
$310,903.68
6-30-56
Cash
$ 10,850.01
Materials & other charges
2,591.60
Cash paid on account
$ 5,726.45
Other credits
812.80
$ 13,441.61
$ 6,539.25
$ 6,902.36
$317,806.04
6-30-57
Cash
0
Other charges
$ 3,230.04
Cash paid on account
0
Other credits
$ 3,230.04
Charge Off -
(Note… $205,000.00)
Open Acct…. 45,876.09
$250,876.09
($250,876.09)
$ 66,929.95
6-30-58
Cash
0
Other charges
$ 7.49
Other credits
$ 2,115.00
Charge Off
36,927.64
($ 39,035.15)
$ 27,894.80
*289 The open account that Tuftwick maintained with Edinburgh follows: Debit
Credit
Balance
8/31/47
Rent Greensboro Machinery - 2/18/47-8/31/47
$ 2,003.42
Balance
$ 2,003.42
8/31/48
Rent Greensboro Machinery - 9/1/47-8/31/48
3,750.00
Balance
5,753.42
8/ 4/49
By check
$ 8,906.25
8/31/49
Rent Greensboro Machinery - 9/1/48-8/31/49
3,750.00
8/31/49
Invoice dyeing and laundering bedspreads
670.93
Balance
(73.76)
9/ 9/49
Invoice fringe
404.35
9/26/49
Invoice fringe
242.43
10/12/49
By cash deposit Asheboro Bldg.
1,000.00
2/14/50
By cash deposit
123.30
2/23/50
By cash deposit
560.07
4/28/50
By cash deposit
510.41
6/16/50
Cash paid Carolina Rugs Machinery
11,429.74
6/16/50
Carolina Rugs accounts receivable assumed by
Edinburgh Corp. as part of liquidating dividend
6,750.51
8/31/50
Balance due Spiral Yarn
943.92
8/31/50
Rental Asheboro Bldgs. - Oct. 1949-Aug. 1950
4,400.00
8/31/50
Rent Greensboro Machinery - 9/1/49-8/31/50
3,750.00
8/31/50
Adjusting dyeing and fringe entries
1,217.93
Balance
26,871.34
8/31/51
Rent Greensboro Machinery -
9/1/50-8/31/51… $3,750.00
RentCandor Machinery… 3,000.00
Rent Asheboro Bldg… 4,800.00
11,550.00
Balance
38,421.34
7/31/52
To check
9,000.00
7/12/52
To check
6,000.00
7/ 9/52
To check
5,000.00
7/31/52
Invoice Designing Services (H. M. Strickland)
300.00
7/31/52
Tel. and tel. June and July
105.31
8/10/52
To check
12,000.00
8/31/52
Rental Airbase Warehouse
600.00
8/30/52
Rental Asheboro Bldg. - 9/1/51-7/31/52
4,400.00
8/31/52
Reversing entry above
4,400.00
8/31/52
Charged off
23,607.36
Balance
47,219.29
9/ 2/52
Check to Scotland Mills for Tuftwick
5,000.00
9/26/52
By check
105.31
10/27/52
By check
5,000.00
11/14/52
Check to Scotland Mills for Tuftwick
5,000.00
12/31/52
Rent credited Joe Steed, Candor, N.C.
300.00
4/30/53
Interest paid Commercial State Bank
262.50
4/30/53
Interest paid The State Bank
262.50
5/25/53
By check
525.00
7/31/53
Machinery sold Russell-Lacey Co.
924.20
8/ 7/53
Interest paid Commercial State Bank
200.00
8/ 7/53
Interest paid The State Bank
174.99
Balance
53,713.17
9/30/53
Interest paid The State Bank
$ 200.00
9/30/53
Interest paid Commercial State Bank
200.00
11/30/53
Interest paid Commercial State Bank
200.00
11/30/53
Interest paid The State Bank
200.00
1/27/54
Interest paid The State Bank
200.00
1/27/54
Interest paid The State Bank
200.00
5/31/54
Interest paid Commercial State Bank
200.00
7/22/54
Interest paid Commercial State Bank
100.00
7/22/54
Interest paid The State Bank
100.00
8/19/54
Paid Commercial State Bank on note
5,000.00
8/19/54
Interest paid Commercial State Bank
83.33
Balance
$60,396.50
8/31/54
Charge-off
$8,136.11
Balance
52,260.39
9/16/54
Reducing Commercial State Bank note
2,500.00
9/16/54
Interest paid Commercial State Bank
75.00
9/30/54
Paid Miller Motor Express
121.65
10/27/54
Reducing Commercial State Bank note
2,500.00
10/27/54
Interest paid Commercial State Bank
75.00
10/28/54
Paid Miller Motor Express
83.22
10/30/54
Paid Miller Motor Express
38.92
11/10/54
By cash
2,500.00
11/20/54
Check reducing Commercial State Bank note
2,500.00
11/18/54
By cash paying Miller Motor Express charges
243.79
11/20/54
Interest paid Commercial State Bank
50.00
12/17/54
By cash
2,500.00
12/31/54
Interest paid Commercial State Bank
58.33
2/12/55
Interest paid
116.67
8/31/55
Charge-off
3,103.08
8/31/55
Balance
52,032.31
8/31/56
Machinery
985.00
8/31/56
Charge-off
38,595.12
Balance
14,422.19
8/31/57
Charge-off
4,765.70
Balance
9,656.49
8/31/58
Charge-off
623.41
Balance
9,033.08
8/31/59
Charge-off
1,675.77
Balance
7,357.31
*290 Tuftwick proved to be an unprofitable operation, having sales, net operating losses and one gain during its existence as follows: Profit
Year Ended
Sales
(Loss)
July 31, 1947 *
$ 205,166.95
[ 85,588.41)
July 31, 1948
870,389.05
( 20,991.31)
July 31, 1949
802,689.52
( 59,842.33)
July 31, 1950
1,276,430.73
( 18,812.92)
July 31, 1951
1,234,709.81
( 8,578.62)
July 31, 1952
1,146,544.58
(211,272.56)
July 31, 1953
946,130.33
13,170.68
July 31, 1954
386,279.30
( 83,380.27)
July 31, 1955
275,408.76
( 65,476.24)
July 31, 1956
284,179.34
( 61,592.26)
July 31, 1957
( 9,529.59)
During the first year Tuftwick's loss was caused partly by the normal expenses of start-up and the expenses of training help. This loss was greatly intensified by a fire in February of 1947 which destroyed its only production facility when the post-war market for textiles was very good. This fire adversely affected the first 2 years of operations. In the fiscal years ending July 31, 1950 and July 31, 1951, Tuftwick managed to reduce its loss and seemed to be approaching a break-even point. This progress was dramatically reversed *291 in 1952 when Tuftwick lost $211,272.56. This loss was due in large part to the expenses incident to discontinuing the production and sale of bedspreads which had proved to be an unprofitable part of the business. For the fiscal year ending July 31, 1953, Tuftwick showed a small profit. In each succeeding year it lost money until its dissolution in 1956. Schloss, the president of Tuftwick, attributed Tuftwick's failure to its uncompetitive position in the industry. According to his testimony, before the war all textile companies started in the tufting business with small machines having one and two needles. Soon after Tuftwick started business multiple needle machines were invented, with some machines having as many as 12 needles. These new multiple needle machines were up to 18 feet wide, and one operator could produce as much as 200 operators on the old machines. The new machines were later installed at Scotland but not at Tuftwick. Consequently Tuftwick could not effectively compete. In spite of its record of almost continuous losses, Tuftwick was able to continue operating in part because of the leniency of its creditors, Scotland and Edinburgh, and in part because of a factoring *292 agreement with Meinhard, Greeff & Co. (hereinafter referred to as Meinhard, Greeff) of New York. In the textile industry a factor will guarantee for a fee the collection of accounts receivable. After a sale is made, the account receivable is transferred to the factor and the company making the sale can draw equivalent cash from the factor. This arrangement assured Tuftwick of a continuous source of cash from the beginning of its operation. On January 26, 1950, Scotland gave Meinhard, Greeff a subordination agreement to cover overadvances made by such firm to Tuftwick up to $75,000. The term overadvances means advances over and above the accounts receivable which are being factored. Since Tuftwick already owed Scotland $177,489.53 at that time Meinhard, Greeff required Scotland to subordinate its claims against Tuftwick to any overadvances to the extent of $75,000. The agreement between Tuftwick and Meinhard, Greeff was amended on June 1, 1952, so that thereafter the factors would continue to advance money upon Tuftwick's inventories and accounts receivable, but that only two-thirds of the amounts thus advanced would be turned over to Tuftwick, the remainder being credited by *293 the factors on Tuftwick's current indebtedness. Meinhard, Greeff finally liquidated its factoring account and subordination agreement with Tuftwick on February 11, 1953. The earned deficit and net worth of Tuftwick from the end of its first period of operations through July 31, 1956, were as follows: Year Ended
Deficit
Net Worth
July 31, 1947
$ 85,588.41
$ 64,411.59
July 31, 1948
110,157.12
64,842.88
July 31, 1949
169,999.45
32,500.42
July 31, 1950
188,812.37
11,187.63
July 31, 1951
197,390.99
2,609.01
July 31, 1952
408,663.65
(208,663.55)
July 31, 1953
395,492.87
(195,492.87)
July 31, 1954
$478,873.14
[278,873.14)
July 31, 1955
544,349.38
(344,349.38)
July 31, 1956
605,941.64
(405,941.64)
On June 1, 1952, after Tuftwick's net worth had become a minus figure, a creditors' committee consisting of Halbert M. Jones, Edwin Morgan and James C. McKinnon took over its active management. Schloss resigned as president on the same day. At a meeting of stockholders and directors on January 26, 1953, Morgan, Jones and McKinnon were elected directors; Morgan was elected president, Jones was elected vice president, and McKinnon was elected *294 secretary-treasurer. The minutes of a special meeting of stockholders of Tuftwick dated January 26, 1953, read in part as follows: that in May, 1952, it was found that the financial condition of the corporation was such that its stockholders no longer had any equity in their stock, and that the corporation could not continue to operate unless it received assistance from its creditors * * * The minutes of the meeting also mentioned that since June 1, 1952, the creditors' committee, acting in the name of and on behalf of the corporation, has borrowed from the Edinburgh Corporation the sum of approximately thirtyseven thousand ($37,000.00) dollars, which was necessary to the continued operation of the business of the corporation, and has used the same in carrying on its business. * * * it was necessary to the continued operation of the business that the corporation should purchase from Scotland Mills, Incorporated, on a credit a quantity of yarns and other materials to the amount of $102,079.20, of which the sum of $48,627.28 is still unpaid; The stockholders formally ratified and approved the actions of the creditors' committee mentioned above. The minutes of a special *295 meeting of the board of directors of Tuftwick held January 26, 1953, read in part as follows: Resolved that this corporation shall issue its notes, under seal, bearing interest thereon after maturity at the rate of 4% per annum, and becoming due and payable three years after the date of each note, to the following corporations in the amounts shown below: Name of Creditor
Amount of Loan
Scotland Mills, Inc.
$205,000.00
Edinburgh Corporation
53,000.00
On February 1, 1953, Scotland credited Tuftwick's accounts receivable in the amount of $205,000, representing the conversion of that amount of open accounts receivable from Tuftwick into a long-term note stated as above. At the close of each of the taxable years set forth below Edinburgh's officers and accountant analyzed the Tuftwick assets available for general creditors, computed the amount of the potential recovery on the Tuftwick debt, and charged off the balance as a partially worthless debt in the amounts deducted on the Edinburgh tax returns as follows: Year ended August 31, 1952
$23,607.36
Year ended August 31, 1954
8,136.11
Year ended August 31, 1955
3,103.08
Year ended August 31, 1956
38,595.12
Year ended August 31, 1957
4,765.70
Year ended August 31, 1958
623.41
Year ended August 31, 1959
1,675.77
*296 In determining the amount Edinburgh might expect to recover from Tuftwick, the respondent eliminated from the Tuftwick account receivable on Edinburgh's books the net additions made from September 1, 1952 to August 31, 1956. As of September 1, 1952, Tuftwick was insolvent, having a minus net worth of approximately $200,000. The respondent's position is that these net advances made to an insolvent company cannot be considered loans but are rather contributions to capital. The net advances to Tuftwick disallowed by respondent during the relevant years are as follows: Net additions to account
Period 9-1-52 to 8-31-54
$13,177.21
Year 9-1-54 to 8-31-55
2,875.00
Year 9-1-55 to 8-31-56
985.00
$17,037.21
The respondent then recomputed the amount of Edinburgh's estimated recovery for each year and determined an allowable bad debt deduction for each of the taxable years as follows: August 31, 1956
$23,543.87
August 31, 1957
4,109.62
August 31, 1958
539.56
August 31, 1959
1,440.67
For its fiscal year ended June 30, 1957, Scotland claimed a bad debt deduction computed as follows: Tuftwick note
$205,000.00
Open account
112,806.04
$317,806.04
Expected Recovery
66,929.95
Claimed bad debt
$250,876.09
*297 On its books and records as of June 30, 1958, and on its return for fiscal 1958, Scotland charged off as a bad debt $36,927.64 of the balance of the Tuftwick account. The respondent denied the deduction for both years claiming a valid indebtedness never existed. The minutes of a special meeting of the board of directors of Scotland dated July 18, 1956, recite that the board of directors of Tuftwick had decided on July 5, 1956, it would be best to "dissolve the corporation and liquidate since the company is insolvent and there is no promise of future profits." In addition, the treasurer of Scotland was authorized and directed to write off as a business bad debt at the end of the fiscal year all or whatever part he deemed uncollectible of the Tuftwick account and to write off as a completely worthless investment any stock the company held in Tuftwick. Tuftwick ceased operations as of July 21, 1956. Opinion The respondent denied Scotland's bad debt deductions for fiscal years 1957 and 1958 on two grounds: (1) that Tuftwick was not adequately capitalized and thus Scotland's advances must be considered contributions to capital (respondent argues in additional support of this ground *298 that Scotland was a principal stockholder in Tuftwick); and (2) alternatively, that Scotland's advances after September 1, 1952, cannot be considered loans because they were made to an insolvent company. There is great uncertainty in the decided cases as to what constitutes adequate capitalization. The courts have been notably reluctant to adopt objective or fixed standards in deciding whether the capitalization of a given company is too "thin." Each case is decided on its particular facts. The most careful and painstaking review of applicable authority will not reveal a simple formula or automatic standard to be applied to any given case. Isider Dobkin, 15 T.C. 31 (1950), affirmed per curiam 192 F. 2d 392 (C.A. 2, 1951); Hoguet Real Estate Corporation, 30 T.C. 580 (1958); Arlington Park Jockey Club v. Sauber, 164 F. Supp. 576 (N.D. Illinois, 1958). An amount of capital which would be sufficient to launch a company in one industry might be completely inadequate by the standards of another industry. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). When Tuftwick was organized, there were "material amounts *299 of capital" invested in the company. John Kelley Co. v. Commissioner, supra at 526. We are not here dealing with a case where the parties knew that advances grossly disproportionate to the original capital stock would be required in the future, cf. Schnitzer v. Commissioner, 183 F. 2d 70 (C.A. 9, 1950), affirming 13 T.C. 43 (1949), and Matthiessen v. Commissioner, 194 F. 2d 659 (C.A. 2, 1952), affirming 16 T.C. 781 (1951). Scotland received its first share of Tuftwick common stock on October 16, 1946. On July 31, 1947, Scotland was issued an additional 297 such shares. In payment for these 298 shares of stock, Scotland made a credit of $60,000 to the Tuftwick account receivable on its books on August 30, 1947. On March 23, 1948, Scotland bought 200 shares of Tuftwick's preferred stock by crediting $20,000 to Tuftwick's account receivable on its books. On August 31, 1958, Scotland acquired an additional 112.5 shares of Tuftwick common stock from L. S. Woodson for $9,000 in cash. At the time of incorporation, Scotland actually advanced a relatively small amount of cash to Tuftwick but the exact amount cannot *300 be determined from the record. Woodson and Schloss paid cash to buy a building for Tuftwick at Bynum, North Carolina. Woodson and Schloss also contributed an undetermined amount of cash to Tuftwick upon incorporation, and Edinburgh agreed to rent it certain buildings and equipment for production purposes. Although Tuftwick started business with little cash in the till, this was not a real handicap. Tuftwick was able to buy its raw materials and supplies from Scotland on credit. In addition Tuftwick was assured of a regular supply of cash from any sales it made because of its factoring agreement with Meinhard, Greeff. Tuftwick's physical facilities and its arrangements with Scotland and Meinhard, Greeff constituted an adequate basis for starting business. What amounts to adequate capitalization varies according to the industry and within the industry according to the type of operation planned. We must give consideration to expert testimony as to whether a given company is adequately capitalized by the standards of the industry. Harry J. Delaney has been in the factoring business for over *301 41 years and his principal activity therein has been with the textile industry. During here relevant times he was executive vice president and director and secretary of Meinhard, Greeff. He testified as follows at the trial: Q. So that when you undertake to enter into a factoring arrangement for a mill, what sort of information do you get, and upon what do you base your factoring arrangements? A. We are primarily interested in three factors when we look at a piece of new business, and we start with the old principle of credit, which is the first ingredient, there must be good character; without it we are not even interested, if a man should have a bankruptcy record or have the reputation of being unethical in his business practices. The second most important element is the capacity of management, have they got the ability to take the tools of production, with a good sales organization, and distribute a product at a profit; and thirdly, and this might sound very strange to people who are not in the banking business, we look at capital as the third ingredient, because we feel that if a man has reasonable resources, if he gets the proper cooperation of people who will supply raw *302 material, or get the proper cooperation of a bank or a factor, with his talent he ought to be able to make money. Delaney thought Tuftwick was adequately capitalized. Respondent asks us to find Tuftwick undercapitalized merely because it started business with a small amount of cash on hand, and Scotland had to advance cash to it during its first year of operations to meet expenses normally associated with starting up a business. We have often held the opposite of this to be true. In Janet McBride, 23 T.C. 926 (1955), acq. 1955-2 C.B. 7, an oil company was incorporated with capital stock of $30,000. Oil and gas leases were transferred to the company upon incorporation, but at the time of incorporation, "No cash was invested in the Oil Company * * * it being expected that McBride [a principal stockholder] would handle the financing of the operations." We found the company to be adequately capitalized. In Earle v. W. J. Jones & Son, 200 F. 2d 846 (C.A. 9, 1952), a Mexican mining company was capitalized with only $1,000 in cash and an option covering the mining rights to certain property. Soon after incorporation a stockholder made *303 large cash advances so that the company could meet operating expenses. The company was held to be adequately capitalized. In Drown v. United States, 203 F. Supp. 514 (S.D.Calif., 1962), a clothes designing company was started up with $15,000 of paid-in capital, but before a single sale had been made, a 50 percent stockholder made cash advances to it of $85,000. The court found (at page 515) that the parties intended Drown to advance "sums of money to get the business started." The court rejected the Government's argument that the company was inadequately capitalized. We will not substitute our business judgment for that of the parties absent compelling reasons. We have no grounds for finding that Tuftwick would have started business on surer footing if Scotland had made a cash investment of $60,000 instead of a credit to an open account. At the end of its first 9 months of operation, July 31, 1947, Tuftwick had cash, receivables, inventories, fixed assets, leasehold improvements and other assets amounting to $154,767.44. We think that Tuftwick was adequately capitalized. *304 The respondent's second contention is that Scotland's advances to Tuftwick, being those of a principal stockholder, did not create a bona fide indebtedness because the dealings of the parties were not typical of a debtorcreditor relationship; and since Tuftwick did not have adequate cash to meet all its needs, the advances of Scotland must be considered continuing contributions to the capital of an inadequately capitalized company. Petitioner answers that the parties intended the advances to be loans, treated them as loans, and had a valid business purpose for the method of financing employed. Transactions between a corporation and a major stockholder must be closely examined. A bad debt deduction is a matter of legislative grace and the burden of proving the existence of a debt is on the taxpayer. Without trying to summarize the many and confusing cases on the subject, it is sufficient to say they indicate that the intention of the parties is a major factor in deciding whether advances by a stockholder to a corporation amount to contributions to capital or create loans. Maloney v. Spencer, 172 F. 2d 638 *305 (C.A. 9, 1949); Los Angeles Shipbuilding & Drydock Corp. v. United States, 289 F. 2d 222 (C.A. 9, 1961). This is a question of fact to be determined by the trier of facts. Matthiessen v. Commissioner, supra.By intent of the parties we mean objective and demonstrable manifestations of intent and not just the verbal declarations of intent made by the self-interested taxpayer. Maloney v. Spencer, supra; Isidor Dobkin, supra.
In determining this intent courts consider and weigh such factors as the entries on the books of the corporation, the debt-equity ratio, whether the company is adequately capitalized, the relationship of the parties, whether the advances are in proportion to common stock holdings, the provision for interest, the existence of any agreement to share losses in proportion to stockholdings, priorities, efforts to enforce collection, etc. Drown v. United States, supra; O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court. Each of these factors is helpful, but no one is conclusive. Some cases deny the deduction even *306 though the parties have used all the formalities of a loan Gilbert v. Commissioner, 262 F. 2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court. Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956); Wachovia Bank and Trust Company v. United States, 288 F. 2d 750 (C.A. 4, 1961). In the instant case the following factors seem to justify treatment of these advances as a loan: the amount of capital to be invested in Tuftwick was formally limited to $87,500 by Scotland's board of directors; the advances were carried on Scotland's books as an account receivable; they were not made in proportion to Scotland's stock ownership; the officers testified that they intended these amounts to be loans; Tuftwick made continual payments on the account; after nearly 7 years and when in 1952 the advances aggregated a net of almost $200,000 a written note was obtained with provision for interest payments. In deciding whether the advances in question deserve treatment as loans, we think it highly significant that the parties had a valid business purpose for the method of financing employed. Respondent argues *307 that Tuftwick was capitalized as it was in order to save taxes for Scotland if the company should fail. Instead of contributing $60,000 in cash to Tuftwick, Scotland gave it an open account of $60,000. In this way Scotland could have the minimum out-of-pocket expense and charge off as a bad debt all of its out-of-pocket advances if Tuftwick should turn out to be an unprofitable investment. We think the record indicates a legitimate business purpose for making advances on open account to Tuftwick. Scotland wanted to expand the market for its products, particularly chenille bedspreads, and Tuftwick afforded it this outlet. In addition the materials produced by Tuftwick would provide a broader line for the bedspread sales of Morgan-Jones, the same selling agent used by Scotland, and Scotland was an important stockholder in Morgan-Jones. Thus in a real sense the purpose of organizing Tuftwick could only be achieved by sales to Tuftwick. It would have been pointless for Scotland to advance this $60,000 to Tuftwick in cash to be used immediately in purchasing supplies from Scotland. Scotland's main interest in Tuftwick was not as an [*] investment but as an outlet for Scotland's products, *308 and the open account credit was at the very least a continuing lure for Tuftwick's business so that the credit could be used. Neither the testimony of the principals nor the nature of Scotland's and Tuftwick's business relationship supports respondent's contention that Scotland intended to avoid taxes by selling materials and supplies to Tuftwick on open account. Respondent contends that it was evident very early that Tuftwick was inadequately capitalized because it was unable to meet all of its operating expenses, and therefore the advances of cash and materials by Scotland amount to a contribution to capital. [1] The applicable cases establish that advances to a newly organized company to help it get started can be considered loans even though subsequent events prove the company's need for much more cash than was originally anticipated. In Earle v. W. J. Jones & Son, supra, the organizers *309 thought that a loan of $50,000 would suffice to develop and commence operation of certain gold mines. At the outset the company had $1,000 in cash in addition to its mining properties. During the 4 years of its life, the two principal stockholders made advances totaling $317,106 receiving the company's notes therefor. The original estimate of $50,000 in loans proved wrong. After considering all the facts the court held the advances to be loans with the unpaid balances deductible as bad debt losses. The court emphasized that the investors had, at the outset, believed in good faith that no more than $50,000 in expenditures would be required to make the mine profitable. After 4 years and with the aid of hindsight, it appeared that the corporation had taken on an excessive debt structure. The court said this "was not the result of design but of the unfortunate course of events." Earle v. J. W. Jones & Son, supra at 851. To the same effect is Janet McBride, supra, in which case a company had started in the business of developing oil leases with no cash on hand. A shareholder advanced $10,000 during its first year of operations and later borrowed an additional *310 $15,000 from a bank and advanced it to the company. The court found that these advances were intended to be loans rather than contributions to capital and were entitled to treatment as loans. In Drown v. United States, supra, a company in the business of designing clothes was incorporated and started business with no physical assets except for $15,000 in cash. A 50 percent stockholder made cash advances to the company of $139,000 over the next 2 years; advances of $85,000 were necessary before a single sale was made in order to prepare the company for its opening. The court found that the organizers "underestimated the amount of money necessary to start this business." The court also found (at page 520) that the shareholder expected "the business to be successful and that the loans, at least up to $50,000, would be repaid." The taxpayer was allowed to write off $50,000 of his total loans as a business bad debt; the court rejected the respondent's argument that the company was inadequately capitalized because it could not meet operating expenses, and that therefore the advances constituted a contribution to capital. The above cases employ *311 the test of the foreseeable needs of the business in deciding whether advances made by a shareholder to help the company meet its operating expenses deserve treatment as debt or equity. The important thing is the taxpayer's honesty and good faith rather than his accuracy in predicting the amount of money necessary to start the business operating. In the instant case Scotland thought that Tuftwick had a reasonable chance of success when it started business with the resources it had. Sun Spun, which also manufactured tufted bedspreads, had been founded with very small capital and had proved highly successful. The fire in Tuftwick's plant in 1947 had an adverse effect on production and sales for about 2 years, but the main factor in Tuftwick's failure was the invention of the multi-needle machines soon after the war which effected a technological change in the industry. The new machines made Tuftwick uncompetitive. These events were not foreseen and were not foreseeable. Considering all of the above factors, we conclude and hold that at least part of Scotland's net advances to Tuftwick were intended to be loans and are entitled to treatment *312 as loans. The cases relied on by the respondent are distinguishable on their facts. In W. F. Young, Inc. v. Commissioner, 120 F. 2d 159 (C.A. 1, 1941), the court found that the officers of the company believed that the amounts advanced would never be repaid. In Schnitzer v. Commissioner, supra, the advances were made on open account to a corporation intending to build and operate a steel mill. The stockholders knew when the advances were made that the total authorized capital of $250,000 was only one-fourth of the minimum construction costs of $1,000,000. In addition the capital outstanding only amounted to $187,000, and the shareholders agreed to bear losses in proportion to their shareholdings. In Matthiessen v. Commissioner, supra, it was known that the advances were greatly disproportionate to the capital stock that would be required in the future. In American-La France-Foamite Corporation v. Commissioner, 284 F. 2d 723 (C.A. 2, 1960), affirming a Memorandum Opinion of this Court, the corporation had virtually no assets when it started business. The shareholder promised to loan the company enough to meet all its operating *313 expenses during its first 5 years of operation. In the first 2 years the company made no sales at all. American-La France-Foamite Corporation involved cash advances, and no notes were ever given. It is settled that there can be no deduction for a bad debt when the debt was worthless when contracted and when the creditor lent the money with no reasonable hope or expectation of repayment. W. F. Young, Inc. v. Commissioner, supra. Finding when there is no reasonable hope of recovering advances to a corporation is not susceptible of easy decision by applying an automatic standard or formula. This depends on a careful evaluation of the company's condition and prospects. After reviewing the 12-year history of Tuftwick with its record of almost continuous losses, we conclude that not all of Scotland's advances to Tuftwick were bona fide loans and made with reasonable hope of recovery. Choosing a certain point in time, when advances to a company no longer deserve treatment as loans, is necessarily arbitrary, but a definite date has to be set. We believe that Scotland could have had *314 no reasonable hope of recovering the net advances it made after September 1, 1952, because Tuftwick was then insolvent. At the close of its fiscal year ending July 31, 1952, Tuftwick had a minus net worth of $208,663.55. We do not think an arm's-length creditor would continue to make unsecured loans to Tuftwick in that condition. In fact on June 1, 1952, Meinhard, Greeff had amended its factoring agreement with Tuftwick to the effect that it would thereafter advance only two-thirds of the proceeds to Tuftwick, and would apply the remaining one-third to reduction of existing indebtedness. The conclusion is inescapable that Meinhard, Greeff, an arm's-length creditor, felt uncertain about Tuftwick's ability to pay Meinhard, Greeff's overadvances. In addition, during May of 1952, the creditors' committee had taken over the active management of Tuftwick. A normal creditor would have required adequate security for any future loans. Instead Scotland and Edinburgh did just the opposite. During the next several months Edinburgh made unsecured loans to Tuftwick totaling $37,000 and Scotland advanced on credit yarns and other materials worth $102,079.20. Scotland did nothing to protect or secure *315 its outstanding loan to Tuftwick. We do not think that a disinterested creditor would continue to make unsecured loans to a company with a net worth deficit of about $200,000. It might be that Scotland deemed Tuftwick to be worth all of the advances which were made because of its potential as a sales outlet for Scotland's products. But in view of Tuftwick's condition, after September 1, 1952, we think Scotland's only interest in Tuftwick thereafter was as an investment. Respondent has referred us to several cases holding that absent unusual circumstances loans made to an insolvent company are made with no reasonable hope of recovery. Fred A. Bihlmaier, 17 T.C. 620 (1951); George B. Markle, Jr., 17 T.C. 1593 (1952). Petitioner argues that by September 1, 1952, Tuftwick was starting on its first profitable year. Nevertheless, on September 1, 1952, Tuftwick's outstanding account with Scotland stood at $211,032.36 and during the next year it increased by $34,609.71; Tuftwick's profit of $13,170.68 seems very small by comparison. It is also significant that Meinhard, Greeff, a firm familiar with the textile industry, cancelled its factoring agreement with *316 Tuftwick on February 11, 1953, when the company was in the midst of its first profitable year. In Wilfred J. Funk, 35 T.C. 42 (1960), a stockholder advanced money in 1952 and 1953 to a corporation that had lost money consistently for 4 years and had a deficit in surplus of $101,205.10. The petitioner testified that in the publishing industry past experience had shown that one best seller would be sufficient to put the company on a profitable operating basis. A new edition of a formerly successful book was published and advertised extensively, but the efforts were unsuccessful. The company failed. We denied a bad debt deduction for the advances made during 1952 and 1953, saying at p. 50: Advances made under such rapidly declining financial conditions could hardly have been made with a reasonable expectation of repayment, apart from the gamble based upon possible future corporate earnings. We think the reasoning in Wilfred J. Funk is equally applicable to the instant case. Accordingly, we hold that the net advances made by Scotland to Tuftwick after September 1, 1952, must be treated as contributions to capital rather than loans. Issue 2 The respondent denied *317 loan treatment to the net advances made by Edinburgh to Tuftwick from September 1, 1952 to August 31, 1956, on the grounds that there was no reasonable hope of repayment since Tuftwick was insolvent at the time. As was true in the case of Scotland, Edinburgh did not seem to be a normal creditor in its dealings with Tuftwick after May 1, 1952. Shortly after the creditors' committee took over the active management of Tuftwick, Edinburgh made cash advances of $37,000 and took no security for this purported loan. This was at a time when the minutes of a Tuftwick stockholders' meeting stated that "the financial condition of the corporation * * * [is] such that its stockholders no longer * * * [have] any equity in their stock * * *." We do not think that an arm's-length creditor would have made unsecured loans under those conditions. In Fred A. Bihlmaier, supra, the taxpayer charged off his 1945 advances to a company as being worthless, but made additional advances in 1946 to the same company. The Court denied the petitioner a bad debt deduction for the advances made during 1946, giving as a reason the taxpayer's decision to charge off as worthless on his tax return *318 his 1945 advances. Similarly, in the instant case Edinburgh on its tax return for the fiscal year ending August 31, 1952, charged off part of Tuftwick's outstanding indebtedness. The record in this case will not do more than support a vague feeling by Edinburgh that Tuftwick had turned the corner. This is insufficient support for petitioner's position. As of September 1, 1952, Tuftwick owed Edinburgh $47,219.29, which is more than four times the profit eventually earned by Tuftwick in fiscal 1953. In addition Tuftwick owed Scotland $211,032.36. We conclude that Edinburgh's net advances to Tuftwick from September 1, 1952 to August 31, 1956, were not made with reasonable expectation of repayment and do not deserve treatment as loans. Issue 3 The third issue for decision is whether Edinburgh is entitled to a net operating loss deduction in its fiscal year ended August 31, 1954, in the amount of $5,893.04 as reflected in the statutory notice of deficiency by virtue of a net operating loss carry back from its fiscal year ended August 31, 1956. Edinburgh contests respondent's action of not allowing it to take into account its net advances to Tuftwick after September 1, 1952, in *319 determining its net operating loss for the fiscal year ended August 31, 1956. This issue is decided in favor of the respondent by virtue of the resolution of Issue 2. Decisions will be entered under Rule 50. Footnotes
*. Nine-month period.↩
1. The respondent's argument that Scotland was running Tuftwick out of its pocket by cirtue of its cash advances is unconvincing because during the first 7 years of its operation, Tuftwick's cash payments to Scotland exceeded Scotland's cash advances to it by $421,160.53.↩